# No. 20-15506

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SOUTHWEST FAIR HOUSING COUNCIL, INC., an Arizona nonprofit
corporation; TAVITA PEÑA; JENNIFER PETERS,

*Plaintiffs-Appellants,*

vs.

MARICOPA DOMESTIC WATER IMPROVEMENT DISTRICT,
an Arizona municipal corporation,

*Defendant-Appellee.*

### BRIEF OF APPELLANTS

On Appeal from the United States District Court
for the District of Arizona
The  Honorable Dominic W. Lanza - Case No. 2:17-cv-01743-DWL

LAW OFFICE OF PAUL GATTONE
 Paul Gattone
  pgattone@aol.com
301 South Convent Ave.
Tucson, AZ 85701
Telephone: (520) 623-1922
Facsimile: (520) 882-3066

BRANCART & BRANCART
 Elizabeth Brancart
  ebrancart@brancart.com
 Christopher Brancart
  cbrancart@brancart.com
Post Office Box 686
Pescadero, CA  94060
Telephone:  (650) 879-0141
Facsimile:  (650) 879-1103

*Attorneys for Plaintiffs-Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, counsel for Plaintiffs-Appellants Southwest Fair Housing Council, Inc., Tavita Peña, and Jennifer Peters certify the following:

Southwest Fair Housing Council, Inc. has no parent company and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

QUESTIONS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Proof of disparate impact under the Fair Housing Act requires a showing of "robust causality" between a neutral rule and a discriminatory effect. In this case plaintiffs allege that a water district's rules imposed only on a group of public housing residents have a discriminatory effect because the affected population is  disproportionately made up of members of protected classes. Must plaintiffs show that the water district is responsible for the population disparities in that public housing in order establish a prima facie case of disparate impact?

      B.    Plaintiffs in this case alleged that the water district's rules were discriminatory in their complaint and whether the district acted with discriminatory intent was at issue throughout the litigation. Did the district court err in holding that plaintiffs failed to raise a disparate treatment claim and failed to raise triable issues as to the water district's discriminatory intent?

STATUES AND REGULATIONS CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.   Statutory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

B.   Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

1. The Edwards Circle Public Housing Complex . . . . . . . . . . . . . . . . . . 5

2. Defendant Maricopa Domestic Water Improvement District . . . . . . . 7

3. The District's Public Housing Rules . . . . . . . . . . . . . . . . . . . . . . . . . 8

    a. The District's "Service Deposit" Rule . . . . . . . . . . . . . . . . . . . . . . 9

    b. The District's "Late Payment/Timely Payment" Rule  . . . . . . . . 10

    c. The District's "No Balance on the (Public Housing) Unit" Rule . 12

4. Plaintiffs Tavita Peña and Jennifer Peters . . . . . . . . . . . . . . . . . . . . 13

5. Plaintiff Southwest Fair Housing Council  . . . . . . . . . . . . . . . . . . . 15

C. The Proceedings Below . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

D. The District Court's Summary Judgment Ruling  . . . . . . . . . . . . . . . . . . 17

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A. The district court erred in granting summary judgment on disparate
impact because plaintiffs showed a direct causal relationship between
the District's rules and their discriminatory effect and raised triable
issues regarding the District's justifications and the existence of less
discriminatory alternatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

1.  Fair Housing Act disparate impact standards. . . . . . . . . . . . . . . . . 21

2. Plaintiffs established a prima facie case of disparate impact . . . . . . 26

a. Plaintiffs identified specific rules causing the disproportionately discriminatory effect. . . . . . . . . . . . . . 26

b. Plaintiffs identified the correct population and subgroup. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

c. Plaintiffs measured the discriminatory effect of the District's rules on that population. . . . . . . . . . . . . . . . . . . 27

3. Plaintiffs demonstrated robust causation between the District's rules and disparate impact on protected classes, a requirement that does not call for a showing that the District caused public housing residents to be disproportionately African American, Native American or female-headed households with children.. . . . . . . . . . . . . . . . . 30

4. The district court erred in finding the District's rules to be based on income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

5. The district court erred in concluding that no disparate impact existed because 100% of the residents of Edwards Circle were subject to the Districts policies.. . . . . . . . . . . . . . . . . . . . . . . . . . . 41

6. Plaintiffs raised a triable issues of fact whether the District had a legally sufficient justification for its rules and whether a less discriminatory alternative was available. . . . . . . . . . . . . . . . . . . . . . 42

a. No rational basis or cogent analysis supports the deposit increase imposed by the District on its public housing customers.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

b. No rational basis exists for the District's rule requiring subsequent public housing tenants to pay off balance owed by prior tenants.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

-iv-

   c. <u>The District's rule threatens public housing customers
only with loss of their service deposits for late payment
even though the problem is not limited to public housing
customers.</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

  7. Plaintiffs presented evidence establishing triable issues on
whether the District had less discriminatory alternatives. . . . . . . . 48

B. The district court erred in granting summary judgment in the
District's favor on disparate treatment because that claim was at issue
throughout the case and plaintiffs raised a triable issue of fact on
intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

  1. The district court erred in finding that plaintiffs failed to
raise a disparate treatment claim.. . . . . . . . . . . . . . . . . . . . . . . . . 50

  2. The district court erred in finding that plaintiffs failed to raise a
triable issues of fact supporting their disparate treatment claim. . . . 52

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

NOTICE OF RELATED CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

# TABLE OF AUTHORITIES

## *CASES*

*Affordable Hous. Dev. Corp. v. City of Fresno*
433 F.3d 1182 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Arlington Heights v. Metro. Hous. Corp.*
429 U.S. 252 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Avenue 6E Investments, LLC v. City of Yuma*
818 F.3d 493 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25

*Avenue 6E Investments, Inc. v. City of Yuma*
217 F. Supp. 3d (D. Ariz. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 48, 53

*Charleston Housing Authority v. U.S. Dept. of Agriculture*
419 F.3d 729 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

*City of Los Angeles v. Bank of Am. Corp.*
691 Fed. App'x 464 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 35. 36

*City of Los Angeles v. Wells Fargo & Co.*
691 Fed. App'x 453 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . 36. 36

*City of Los Angeles v. Wells Fargo & Co.*
No. 2:13-CV-09007 ODW
2015 WL 4398858 (C.D. Cal. Jul. 17, 2015) . . . . . . . . . . . . . . . . . . . . . 36

*Coleman v. Quaker Oats Co.*
232 F.3d 1271 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 52

*Columbus Bd. of Ed. v. Penick*
443 U.S. 449 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Corey v. U.S. Dep't of Housing and Urban Dev.*
719 F.3d 322 (4th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Darensburg v. Metro. Transp. Comm'n*
  636 F.3d 511 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Davis v. Weir*
  497 F.2d 139 (5th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Devereaux v. Abbey*
  263 F.3d 1070 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Diaz v. San Jose Unified Sch. Dist.*
  733 F.2d 660 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Gamble v. City of Escondido*
  104 F.3d 300 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Georgia State Conference of the NAACP v. City of LaGrange*
  940 F.3d 627 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Golden v. City of Columbus*
  404 F.3d 950 (6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

*Greater Birmingham Ministries v. Sec'y of State for Alabama*
  966 F.3d 1202 (11th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Griggs v. Duke Power Co.*
  401 U.S. 424 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Halet v. Wend Investment Co.*
  672 F.2d 1305 (9th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Hallmark Developers, Inc. v. Fulton County*
  466 F.3d 1276 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25, 29

*Hardie v. Nat'l Collegiate Athletic Ass'n*
  876 F.3d 312 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Harris v. Itzhaki*
    183 F.3d 1043 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*
    844 F.2d 926 (2d Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 41

*Inclusive Communities Project, Inc. v. Lincoln Property Co.*
    920 F.3d 890 (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . 37, 38, 39, 40

*Keith v. Volpe*
    858 F.2d 467 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 23, 33, 34, 41

*Langlois v. Abington Housing Authority*
    207 F.3d 43 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*McLaughlin v. Richland Shoe Co.*
    486 U.S. 128 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55, 56

*N.A.A.C.P. v. Am. Family Mut. Ins. Co.*
    978 F.2d 287 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*O'Neal v. City of Seattle*
    66 F.3d 1064 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Ojo v. Farmers Grp., Inc.*
    600 F.3d 1205 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*
    759 F. App'x 828 (11th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Pac. Shores Properties, LLC v. City of Newport Beach*
    730 F.3d 1142 (9th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Pfaff v. U.S. Dep't of Hous. & Urban Dev.*
    88 F.3d 739 (9th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Resident Advisory Bd. v. Rizzo*
    564 F.2d 126 (3d Cir. 1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 34, 41

*Reyes v. Waples Mobile Home Park Ltd. P'ship*
    903 F.3d 415 (4th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Ricci v. DeStefano*
    557 U.S. 557 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Sterling v. Vill. of Maywood*
    579 F.2d 1350 (7th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Tex. Dep't of Housing & Cmty. Affairs v.*
    *Inclusive Comm. Project, Inc.*
    576 U.S. 519 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*The Comm. Concerning Cmty. Improvement v. City of Modesto*
    583 F.3d 690 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 41

*Trans World Airlines, Inc. v. Thurston*
    469 U.S. 111 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Twp. of Mount Holly v. Mt. Holly Gardens Citizens in Action, Inc.*
    658 F.3d 375 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Wards Cove Packing Co. v. Atonio*
    490 U.S. 642 (1989). . . . . . . . . . . . . . . . . . . 19, 20, 23, 26, 27, 28, 30, 32

*Watson v. Fort Worth Bank & Trust*
    487 U.S. 977 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*United States v. City of Black Jack*
    508 F.2d 1179 (8th Cir.1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Youritan Constr. Co.*
    370 F. Supp. 643 (N.D. Cal. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Winston v. City of Syracuse*
    887 F.3d 553 (2d Cir. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

## STATUTES

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. §1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
28 U.S.C. §1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fair Housing Act, Title VIII of the Civil Rights Act of 1968
    82 Stat. 81 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    § 804(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5
    § 804(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5
    42 U.S.C. §§ 3601, *et seq* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    42 U.S.C. § 3602(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    42 U.S.C. § 3602(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    42 U.S.C. § 3604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    42 U.S.C. § 3604(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    42 U.S.C. § 3613(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

Fair Housing Amendments Act of 1988
    102 Stat. 1619 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Ariz. Rev. Stat. § 11-952 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## REGULATIONS

24 C.F.R. § 100.70(d)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
24 C.F.R. § 100.500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
85 Fed. Reg. 60288 (Sept. 24, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## OTHER AUTHORITIES

*Reference Manual on Scientific Evidence*, 295 (3rd. 2011). . . . . . . . . . . . . . . . 31

## INTRODUCTION

Plaintiffs in this case – a fair housing council and a current and former resident of public housing located in Pinal County, Arizona – alleged that the defendant water district violated the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.*, when it required public housing customers in its service area to comply with more burdensome rules and procedures to establish water service than those it imposed on non-public housing customers. Plaintiffs showed that the district's rules discriminated on the basis of race, national origin, gender, and familial status utilizing both disparate impact and disparate treatment methods of proof. The district court, nonetheless, granted summary judgment in favor of the district after concluding that plaintiffs' evidence failed to establish a prima facie case of discrimination under either method. The judgment should be reversed because the district court misconstrued the requirements for proof of disparate impact under *Texas Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015), and erred in applying the appropriate standards to analyze plaintiffs' disparate treatment claims.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§1331, 1343 and 42 U.S.C. § 3613(a). Appellate jurisdiction exists under 28 U.S.C. §1291. On March

1

20, 2020, plaintiffs filed a timely notice of appeal from the final judgment entered

on February 21, 2020. Excerpts of Record Volumes 1-4 (hereinafter referred to as

"[vol]-ER-[page]"); 1-ER-9; 2-ER-34.

## QUESTIONS  PRESENTED

A.   Proof of disparate impact under the Fair Housing Act requires a
showing of "robust causality" between a neutral rule and a
discriminatory effect. Where plaintiffs allege that rules
imposed by a water district on public housing residents have a
discriminatory effect because that group is disproportionately
made up of members of protected classes, are plaintiffs
required to show that the water district caused the population
disparities in order to establish a prima facie?

B.   Plaintiffs's complaint alleged that the water district's rules
were discriminatory and whether the district acted with
discriminatory intent was at issue throughout the litigation. Did
the district court err in holding that plaintiffs failed to raise a
disparate treatment claim and failed to raise triable issues as to
the water district's discriminatory intent?

## STATUTES AND REGULATIONS CITED

The text of cited statutes and regulations may be found in the Statutory

Addendum at the back of the brief, cited as "StatAdd:[page]."

## STATEMENT OF THE CASE

**A.   Statutory Framework**

This appeal examines the standards governing proof of disparate impact

and disparate treatment claims under the Fair Housing Act (FHA), Title VIII of the

2

Civil Rights Act of 1968, as amended. Pub.L. 90-284, 82 Stat. 81 (1968); Pub.L. 93-383, 88 Stat. 633 (1974); Pub.L. No. 100-430, 102 Stat. 1619 (1988). The FHA prohibits discriminatory housing practices, 42 U.S.C. § 3602(f), which are codified at 42 U.S.C. §§ 3604-3606 and 3617. StatAdd:2. It authorizes an aggrieved person to sue for relief. 42 U.S.C. § 3613(a); StatAdd:4. It defines "aggrieved person" as any person injured or threatened with injury by commission of a discriminatory housing practice. 42 U.S.C. § 3602(i); StatAdd:2.

This appeal focuses on two discriminatory housing practices, defined in Section 804(b) and 804(a) of the FHA. Section 804(b) makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith because of" race, color, religion, sex, disability, familial status, or national origin. 42 U.S.C. § 3604(b); StatAdd:3. The scope of "provision of services or facilities in connection therewith" is broadly construed. Refusing to provide municipal services or providing such services differently may violate Section 804(b). 24 C.F.R. § 100.70(d)(4); StatAdd:8-9; *The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 715 (9th Cir. 2009) ("*CCCI*") (municipal services covered by the FHA include the timely provision of law-enforcement personnel). Water utility service to a dwelling is clearly covered

3

by Section 804(b). *Georgia State Conference of the NAACP v. City of LaGrange*, 940 F.3d 627, 634 (11th Cir. 2019) (city's refusal to provide utility service to customers unless they paid municipal debts covered by § 804(b)).

Section 804(a) of the FHA makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling" because of race, color, religion, sex, disability, familial status or national origin. 42 U.S.C. § 3604(a); StatAdd:3. The scope of Section 804(a) is also broad. It prohibits not only outright refusals to rent or sell a dwelling, but also any practice that has the effect of making it more difficult for persons in protected classes to obtain housing. *United States v. Youritan Constr. Co.*, 370 F. Supp. 643, 648 (N.D. Cal. 1973) (use of credit check requirement as device to discourage African Americans from applying violated § 3604(a)), *aff'd in relevant part*, 509 F.2d 623 (9th Cir. 1975). The use, for example, of "more burdensome" application procedures, "delaying tactics," and other "forms of discouragement" that impede access to housing opportunities because of protected class violate the FHA. *Corey v. U.S. Dep't of Housing and Urban Dev.*, 719 F.3d 322, 326 (4th Cir. 2013) (citing *Youritan*, 370 F. Supp. at 648).

Thus, discrimination in the provision of essential housing services necessary for access and occupancy of a dwelling may violate either Section

4

804(b) or 804(a). *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010)
(en banc) (discrimination in the denial or pricing of essential housing services –
there homeowner's insurance  – may violate both § 804(b)'s prohibition on
discrimination in the provision of services and § 804(a)'s prohibition on making
housing effectively "unavailable"); *see also N.A.A.C.P. v. Am. Family Mut. Ins.
Co.*, 978 F.2d 287, 301 (7th Cir. 1992) (§ 804(a) covers "discriminatory denials of
insurance, and discriminatory pricing, that effectively preclude ownership of
housing because of the race of the applicant").

Each of these discriminatory housing practices may be established under a
variety of proof theories, including disparate treatment and disparate impact.
*Gamble v. City of Escondido*, 104 F.3d 300, 304-05 (9th Cir. 1997).

## B.    Statement of Facts

### 1.    The Edwards Circle Public Housing Complex

Pinal County owns and operates the 20-unit public housing complex located
at 44945-45067 West Edwards Circle in the City of Maricopa, Arizona. 4-ER-832,
¶ 17; 4-ER-817, ¶ 17; 3-ER-368. The Edwards Circle complex is one of seven
public housing projects in Pinal County managed by the Pinal County Housing
Department (PCHD) and funded by the United States Department of Housing and
Urban Development (HUD). 3-ER-484. PCHD compiles demographic data

regarding persons occupying its public housing units and persons on its public housing waitlist, which it submits to HUD in the form of Resident Characteristics Reports. 2-ER-53, 199. Based on the Resident Characteristics Report data, PCHD's public housing waitlist is comprised of households that are 53.0% White, 13.0% African American, 8.8% American Indian, and 23.7% Hispanic. 2-ER-199. (Data regarding the gender of heads of waitlist households are not part of the report. 2-ER-201; 4-ER-769.)

PCHD draws from its waitlist when units become available in its public housing projects. 3-ER-486-487. PCHD provides the applicant with an offer letter listing the steps that a prospective tenant must complete before the housing is available for occupancy. With respect to the public housing units at Edwards Circle, PCHD requires that each prospective tenant provide PCHD with proof of account numbers and turn-on dates for necessary utilities, including water, gas and electric service, before the prospective tenant may occupy the dwelling. 3-ER 487.

For the 20 public housing units at Edwards Circle, PCHD data show that the tenant population is comprised of households that are 11.1% White, 39.9% African American, 16.7% American Indian, and 33.3% Hispanic. Female-headed households with children make up 89.0% of households. 2-ER-199.

//

6

### 2.      Defendant Maricopa Domestic Water Improvement District

Maricopa Domestic Water Improvement District (the "District" or "MDWID") is a public utility, created by Pinal County in 1986. 2-ER-86. The Edwards Circle public housing project is located on a County "island" within the District's boundaries. 3-ER-324. (For a map showing Edwards Circle and the District's boundaries, see 2-ER-130.) The District is the sole provider of public water services for 312 dwellings within its boundaries, including for each public housing unit at Edwards Circle. 3-ER-326. Early in the District's history, there was an agreement or understanding between Pinal County and the District that the District would provide water service to the public housing units at Edwards Circle. 3-ER-326-327. In 1991, the County paid to install the infrastructure to connect Edwards Circle to the District's water main, paid the District for each water hookup for each public housing unit, and deeded easements to the District for that infrastructure. 2-ER-123-133; 3-ER-348-349. The District receives substantial federal and state funding, including loans from the United States Department of Agriculture (USDA) and Arizona Water Infrastructure Authority and Community Development Block Grants from the City of Maricopa. 2-ER-112-121; 3-ER-528-532.

The USDA loan requires the District to compile demographic data regarding

7

each of the households it serves. 3-ER-530-531, 536-543; 2-ER-201 (Table 4). For each household, the District tabulates the race, ethnicity, and gender of the head of household. 3-ER-537-538; 2-ER-201 (Table 4); 4-ER-768-770. Data produced by the District shows that its residential customer base is comprised of 312 households that are 45.0% White, 2.9% African American, 2.2% American Indian, and 49.7% Hispanic. Female-headed households with children make up 34.3% of households. 2-ER-201.

### 3. The District's Public Housing Rules

This appeal concerns the legality of three rules adopted by the District. The first governs the amount of the service deposit charged to each new customer to establish water service to her dwelling. The second sets forth the penalties for tardy payments for water service. The third requires new customers to pay any outstanding balance owed to the District by the dwelling's prior occupant. These rules imposed two different sets of charges, penalties, and requirements on customers turning solely on a customer's housing status. If a customer occupied one of the 20 public housing units at the Edwards Circle property, there was one set of rules; if a customer occupied any other dwelling in the District, there was a different set of rules. Thus, each rule sorted each customer into one of two dichotomous subgroups. Each subgroup was exclusive, based on whether or not

8

the customer was a public housing resident. The two subgroups were also exhaustive since each customer served by the District fit into only one of the two subgroups, either public housing residents or all other residents.

a.    The District's "Service Deposit" Rule

The District requires all new customers to pay a non-refundable service fee of $20 plus a refundable service deposit. Effective January 1, 2015, the amount of that refundable service deposit depended solely on whether the customer was a public housing resident or a non-public housing resident:  New Edwards Circle public housing residents had to pay a $180 service deposit while new non-public housing residents were required to pay a service deposit of only $55. 2-ER-147-148; 2-ER-151-152 (MDWID Responses to Request for Admission Nos. 1-5). To sort customers into distinct subgroups based on their public housing status, the District created two different application forms for water service, one for public housing customers and another for all others. 2-ER-142, 144-145, 163. It also announced the new rule, inserting a notice into customers' monthly billing statements:

> Pinal County Housing Customer Deposits will increase for New tenants Starting Jan. 1, 2015. This will only effect new residents at the Pinal County Housing Complex. The new Deposit fee will be $180.00.

9

2-ER-262. The District also updated its operating manual to instruct staff how to enforce this disparate treatment, 3-ER-561-562, listing two different deposit amounts for the same domestic water service: One for "MDWID Regular Customers" and another for "Public Housing," 2-ER-165-166. Regardless of a customer's past performance or credit risk, every new public housing tenant had to pay more for their water service deposit because each was a public housing tenant.[1]

### b. The District's "Late Payment/Timely Payment" Rule

Before 2015, the District imposed a generally applicable 1.5% late payment fee on all customers regardless of housing status. 2-ER-144. In January 2015, the District adopted a new "late payment" rule. To apply this new rule, the District first determined whether the customer was a public housing tenant. If the customer fit that classification, then the District charged her the generally applicable, standard 1.5% late fee *and* subjected her to a new four-strikes rule: Public housing

---

[1]Before 2002, the District imposed uniform terms on all domestic water customers, charging each new customer a $50 service deposit and $15 hookup fee. 2-ER-135-136. In March 2002, the District for the first time imposed a higher service deposit of $85 on public housing customers only. 2-ER-138, 248. By 2006, the District increased its hookup fee to $20 to all customers. 2-ER-140. By 2014, the District was using an application specifically for public housing customers and charged them a service deposit of $80 compared to the $55 service deposit charged to non-public housing customers. 2-ER-142, 144-145.

customers who paid their monthly bills late four or more times in any calendar year would not automatically receive back their service deposits even if they were current on their water bills when they disconnected service. Instead, the decision whether to refund a service deposit to public housing customer was left to the "discretion" of the District's governing board. 2-ER-152 (MDWID Response to Request for Admission No. 6). No similar "late payment" rule was imposed on customers who did not reside in public housing dwellings. 2-ER-152 (MDWID Responses to Request for Admission No. 7).

The District also announced in 2015 a companion rule, framed as the converse of the late payment rule. This new "timely payment" rule stated that if a customer was a public housing tenant and if that customer made "timely payments," that customer's service deposit was refundable. 2-ER-152 (MDWID Response to Request for Admission No. 8); 4-ER-782. No similar "timely payment" rule was imposed on customers who did not reside in public housing. 2-ER-152-153 (MDWID Responses to Request for Admission No. 9). The discriminatory treatment and effect was the same under either version of this rule: Only public housing residents were charged a 1.5% late payment fee *and* risked loss of their deposits because of late payments.

//

11

c.      The District's "No Balance on the (Public Housing) Unit" Rule

Although the application forms and amounts varied based on a new

customer's status as a public housing resident, the procedure to start water service

with the District was the same for every customer up until 2013: A customer

completed an application and paid a nonrefundable fee and a refundable service

deposit. Around 2013, however, the District adopted a new rule: As a condition to

establish water service at a public housing dwelling, a customer had to pay off any

balance owed to the District by the dwelling's prior occupant. 2-ER-156 (MDWID

Response to Request for Admission No. 29); 3-ER-478, 489-491; 2-ER-179-182;

3-ER-594 to 4-ER-604-608. Like the District's other rules, this new condition

applied only to public housing residents applying to the District for water service.

Id.

To implement this rule, the District first determined whether the new

customer occupied a public housing unit at Edwards Circle. Id. If the customer met

that condition, then the District determined whether the public housing unit's prior

occupant ended service owing the District money. Id. If the prior occupant left

with an unpaid balance, then the District reduced that balance to a bill and

presented that bill to the new resident for payment. Payment in full of the prior

occupant's unpaid balance was a prerequisite for any public housing resident to

12

obtain water service for her new home. If a public housing resident could not afford to pay the prior occupant's arrearage, plus the nonrefundable fee and the refundable security deposit, then the District refused to provide water to the new resident's dwelling. 4-ER-610. Under PCHD's rules, a public housing resident could not occupy a dwelling unless she presented proof of water service to the dwelling – a consequence that the District understood fully. 4-ER-610 ("And if they don't pay [the prior public housing tenant's balance] they don't get water? A. They don't get the housing."). Like the District's other rules, this rule applied solely to public housing residents. For all other customers, the District looked to the dwelling's owner for payment of unpaid water bills. 3-ER-579-582; 3-ER-594 to 4-ER-604-608; 4-ER-672, 689.

### 4.    Plaintiffs Tavita Peña and Jennifer Peters

In 2001, PCHD qualified Tavita Peña and her four children to rent a public housing dwelling at Edwards Circle. 3-ER-403. PCHD required Peña to provide proof that she had connected utilities, including water, gas, and electricity, as a condition before she and her family could move in. 3-ER-405, 424. For more than 18 years, Peña has made timely payments to the District for water service while residing in public housing at Edwards Circle. 3-ER-408-411, 417.

In 2016, PCHD required Peña to relocate to a smaller unit within Edwards

13

Circle because her children had grown and moved from the household. 3-ER-414, 494-95. Previously, when Peña had moved to a new unit within Edwards Circle in 2003, the District had transferred her water service to the new unit. 3-ER-409-10. This time, however, Peña had to apply for service for the new unit as a new customer, subject to the District's new $200 service deposit for public housing customers. 3-ER-412-417. Peña lacked the funds to pay the higher deposit. 3-ER-416. Her family subsisted on modest payments from Social Security for a disabled son, while her adult daughter covered her water bills. 3-ER-419-22.

Peña called PCHD to advise it that she did not have funds to pay the deposit demanded by the District. 3-ER-416. She tried to get PCHD to delay or stop her transfer until she could raise the money to pay the District's service deposit. 3-ER-428-432. Ultimately, Peña's adult children paid the deposit. 3-ER-417-18. For weeks, however, Peña suffered stress and anxiety, worried that her family might lose their housing and become homeless because she could not afford to pay the District's service deposit. 3-ER-401-403, 424-425, 428-29, 430-432.

PCHD qualified Jennifer Peters and her three children to move into a public housing unit at Edwards Circle in June 2016. 3-ER-444-46, 450; 3-ER-462. Before Peters could occupy her new home, PCHD required that she provide proof that she had connected utilities, including water, gas, and electricity. 3-ER-

14

453. Peters could not obtain water service from the District because she could not afford the $200 service deposit. 3-ER-456-458. At the time, the family's sole source of income was her son's disability payments and occasional child support payments. 3-ER-464. Her monthly bank account balance ranged from a high of about $640 before bills were paid to almost nothing by the end of the month. 3-ER-462.

To pay the District's service deposit, Peters applied to the Community Action Resource Association (CAHRA) for financial assistance, which agreed to pay her $200 deposit to the District. 2-ER-169-172; 3-ER-456-58. (Peters was able to repay CAHRA years later after moving from Edwards Circle. 2-ER-174; 3-ER-462.) Before CAHRA agreed to help Peters, she suffered stress and anxiety, loss of sleep, chest and stomach pains and depression, worried that she might lose a home for her family over her inability to pay the District's service deposit. 3-ER-466, 471-475.

### 5. Plaintiff Southwest Fair Housing Council

Southwest Fair Housing Council (SWFHC) is an Arizona nonprofit corporation based in Tucson. 4-ER-816, ¶ 4. SWFHC is a full service fair housing organization with a mission to achieve and preserve equal access to housing for all people. 4-ER-657. PCHD staff members contacted SWFHC complaining that the

15

District's treatment of public housing residents was unfair, 2-ER-271, 289-290, 303-304, and they referred Peters to SWFHC for assistance, 3-ER-466. After investigating the complaint, SWFHC tried to counteract the effect of the District's unlawful practices by preparing an education and outreach packet for each Edwards Circle household regarding their fair housing rights, which a SWFHC staff member distributed in person, driving from Tucson to Maricopa because of the difficulties of addressing mail to Edwards Circle. 4-ER-659-665. SWFHC staff, including its executive director, were diverted from their regular duties to prepare and distribute those educational materials. 4-ER-661-663. SWFHC also incurred out-of-pocket expenses in conducting that education and outreach to counteract the District's practices. 4-ER-666-668.

## C.     The Proceedings Below

SWFHC, Tavita Peña, and Jennifer Peters filed this action against the District on June 5, 2017, alleging that the District discriminated in the provision of municipal services in violation of the FHA, 42 U.S.C. §§ 3601, *et seq.*, and state law. In May 2018, pursuant to the stipulation of the parties, the district court granted plaintiffs leave to file a first amended complaint adding Pinal County as a defendant. 4-ER-835 (Docs. 37, 39); 4-ER-815. Plaintiffs' first amended complaint alleged that both defendants discriminated in the provision of municipal

16

services and further alleged that Pinal County violated the rights of its public housing residents under federal law. 4-ER-834. After plaintiffs reached a settlement with Pinal County, 1-ER-35, the District sought summary judgment on all of plaintiffs' claims. 4-ER-671. The district court granted that motion and entered judgment against plaintiffs. 1-ER-9.

## D.    The District Court's Summary Judgment Ruling

The District moved for summary judgment on the grounds that plaintiffs failed to establish a prima facie case of disparate impact and the District had legitimate, non-discriminatory reasons for increasing its service deposit. 4-ER-671. Plaintiffs opposed the District's motion with the evidence, recounted above, showing that the District imposed rules that adversely and disproportionately affected African American, Native American and female-headed households with children and generated a triable issue as to whether the District had a legitimate, non-discriminatory justification or whether the District's interests could have been served by a less discriminatory alternative. 2-ER-58-75. Plaintiffs also argued that the evidence created triable issues as to whether the District had engaged in disparate treatment. 2-ER-73-74.

The district court held that plaintiffs could not establish a prima facie case of disparate impact because their evidence failed to satisfy the "robust causality"

requirement discussed by the Supreme Court in *Tex. Dep't of Hous. & Cmty.*

*Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 545 (2015)

("*Inclusive Communities*"):

> The District has adopted a facially race-neutral policy of requiring water customers who reside in public housing to pay a higher security deposit than water customers who reside in non-public housing. Plaintiffs' statistical evidence merely shows that certain groups that are protected under the FHA are more likely to reside in public housing than in non-public housing. Although the inevitable consequence of this housing pattern is that members of protected groups will be statistically more likely to pay the increased deposit, there is nothing "robust" about this causal connection.

1-ER-20. The court also found that the District's rules had no disproportionate

impact on protected classes because

> 100% of protected-group members who reside at West Edwards Circle must pay the increased security-deposit fee, but 100% of the other residents must pay the fee too. Everybody is treated the same, and experiences the same outcome, regardless of membership in a protected group.

1-ER-22. To find disparate impact in this case, the district court concluded,

"would turn the concept of 'robust causality' on its head and ignore *ICP*'s

exhortation that 'serious constitutional questions . . . might arise under the FHA . .

. if [disparate impact] liability were imposed based solely on a showing of a

statistical disparity.'" 1-ER-22 (quoting *Inclusive Communities*, 576 U.S. at 540).

As to plaintiffs' disparate treatment claim, the district court ruled that

plaintiffs had failed to raise that claim in their complaint and, in any event, that the

evidence presented failed to raise an inference that the District acted with

discriminatory intent. 1-ER-23-25.

## SUMMARY OF ARGUMENT

In 2015, in *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities

Project, Inc.*, the Supreme Court held that disparate impact claims are cognizable

under the Fair Housing Act. 576 U.S. at 545. The plaintiff in *Inclusive

Communities* raised a novel theory of liability – that the defendant's allocation of

low-income housing tax credits resulted in a disparate impact on African

Americans because the projects approved had been in predominantly minority

neighborhoods rather than white, suburban neighborhoods. While recognizing

disparate impact as an important tool in enforcing the Fair Housing Act, the Court

cautioned that a plaintiff who relies on that theory must show more than just a

statistical disparity. Instead, he must point to the policy causing the disparity. *Id.* at

542. This "robust causality" requirement "ensures that '[r]acial imbalance ... does

not, without more, establish a prima facie case of disparate impact' and thus

protects defendants from being held liable for racial disparities they did not

create." *Id.* (quoting *Wards Cove Packing Co. v. Antonio*, 490 U.S. 64, 653 (1989),

superseded by statute on other grounds, 42 U.S.C. § 2000e–2(k)).

In this case, plaintiffs followed the direction of *Inclusive Communities* and *Wards Cove* and identified the specific rules that they claimed caused a disproportionately adverse impact on a narrowly defined population. The district court, nonetheless, ignored plaintiffs' evidence and misconstrued the Court's discussion of robust causality in *Inclusive Communities* to require plaintiffs to establish the impossible – that the District's water service rules caused a disproportionate number of African Americans, Native Americans, and female-headed households with children to be public housing residents at Edwards Circle. 1-ER-19-21. That conclusion is not grounded in *Inclusive Communities* nor in the federal circuits' long-established methods of analyzing disparate-impact claims under the Fair Housing Act and should be reversed.

Despite the broad language of plaintiffs' complaint alleging that the District's rules were discriminatory, the district court held that plaintiffs' complaint failed to raise a disparate treatment claim and, in any event, failed to show that the District was motivated by a discriminatory purpose. 1-ER-23-25. Both of those rulings were erroneous. Plaintiffs' complaint and joint reports filed by the parties identifying the claims and defenses to be litigated show that the District was on notice that plaintiffs intended to prove their claims under both disparate impact and disparate treatment theories. The District acknowledged as

much, pleading an affirmative defense that "[d]iscrimination was not a motivating factor in any decisions that the District made with respect to the Plaintiffs." The evidence submitted by plaintiffs generated a genuine issue of material fact whether the District engaged in intentional discrimination by imposing burdensome rules on the Edwards Circle public housing residents whom the District knew were disproportionately protected class members. The judgment should be reversed.

## STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

## ARGUMENT

**A.    The district court erred in granting summary judgment on disparate impact because plaintiffs showed a direct causal relationship between the District's rules and their discriminatory effect and raised triable issues regarding the District's justifications and the existence of less discriminatory alternatives.**

### 1.    Fair Housing Act disparate impact standards

Plaintiffs may prove their FHA claim by utilizing the disparate-impact theory of liability. *Inclusive Communities*, 576 U.S. at 545. To prove a disparate-impact claim, the plaintiff is required to demonstrate that the challenged practices have a "'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." *Id.*, 576 U.S. at 524-25 (quoting *Ricci v.*

*DeStefano*, 557 U.S. 557, 577 (2009)). Disparate impact theory provides a remedy in two situations that disparate treatment may not reach:

> First, '[i]t permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification.' [Citations omitted.] Second, disparate impact ... also targets 'artificial, arbitrary, and unnecessary barriers' to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities.

*Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 503 (9th Cir.), cert. denied, 136 S. Ct. 295 (2016) (quoting *Inclusive Communities*, 576 U.S. at 521). Thus, disparate impact liability "'recognize[s] that the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme.'" *Ave. 6E*, 818 F.3d at 503 (quoting *United States v. City of Black Jack*, 508 F.2d 1179, 1185 (8th Cir.1974)). *See also Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 987 (1988) ("the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination").

Successful proof of disparate impact involves a three-step process. First, the plaintiff must show "(1) the occurrence of certain outwardly neutral ... practices, and (2) a significantly adverse or disproportionate impact on persons of a

particular [type] produced by the [defendant's] facially neutral acts or practices." *CCCI*, 583 F.3d at 711; *Avenue 6E Investments, Inc. v. City of Yuma*, 217 F. Supp. 3d 1040, 1047 (D. Ariz. 2017). Actions have a discriminatory effect if they "actually or predictably result in discrimination." *Pfaff v. U.S. Dep't of Hous. & Urban Dev.*, 88 F.3d 739, 745 (9th Cir.1996); *Keith v. Volpe*, 858 F.2d 467, 482 (9th Cir. 1988). The plaintiffs must point to a specific rule or practice that is allegedly causing the discriminatory effect. *Inclusive Communities*, 576 U.S. at 542; *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989), superseded by statute on other grounds, 42 U.S.C. § 2000e–2(k).

Next, if the plaintiff establishes the discriminatory effect, then the defendant may rebut the plaintiff's proof by "supply[ing] a legally sufficient, nondiscriminatory reason." *CCCI*, 583 F.3d at 711; *Pfaff*, 88 F.3d at 746-47; *Avenue 6E*, 217 F. Supp. 3d at 1047. Finally, if the defendant provides a legitimate justification for the challenged practice, the plaintiff may still prevail by demonstrating that "an alternative practice (1) would 'serve the [defendant's] legitimate ... interest[s],' and (2) would not have a 'similarly undesirable racial effect.'" *Hardie v. Nat'l Collegiate Athletic Ass'n*, 876 F.3d 312, 320 (9th Cir. 2017) (quoting *Wards Cove*, 490 U.S. at 653); *Avenue 6E*, 217 F. Supp. 3d at 1048 (plaintiff may still prevail "upon proving that the substantial, legitimate,

nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect"). *But see Affordable Hous. Dev. Corp. v. City of Fresno*, 433 F.3d 1182, 1195 (9th Cir. 2006) ("We need not and do not decide what other defenses exist to a claim of disparate impact or whether such a showing by a defendant shifts the burden back to the plaintiff to show that no alternative would serve that interest with less discriminatory effect.").

The Supreme Court recognizes that the formulations of the proof required to show a disproportionate effect "have never been framed in terms of any rigid mathematical formula." *Watson*, 487 U.S. at 994-95. Indeed, no single test controls the measurement of disproportionate effect. *Langlois v. Abington Housing Authority*, 207 F.3d 43, 50 (1st Cir. 2000). Nonetheless, several guidelines have emerged from the case law that inform the plaintiff's burden to show disproportionate effect.

First, the validity of any measure of disproportionality depends on the relevant population used to measure the disparity in outcomes. The "appropriate statistical measure must . . . take into account the correct population base and its [demographic] makeup." *Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 520 (9th Cir. 2011); *Hallmark Developers, Inc. v. Fulton County*, 466 F.3d 1276,

24

1286 (11th Cir. 2006) (rejected on other grounds in *Ave. 6E*, 818 F.3d at 512).

Next, the plaintiff must show a discriminatory effect. Two ways of measuring impact are most common: disproportionate representation and disproportionate effect. *Hallmark*, 466 F.3d at 1286. Disproportionate representation compares the demographic distribution (proportions) of persons subject to the challenged rule with the demographic distribution (proportions) of persons in the relevant population. *Id.* Disproportionate effect compares the demographic distribution (proportions) of persons subject to the challenged rule with the demographic distribution (proportions) of person not subject to the rule. *Id.*

Here, the practical difference between these two methods of measuring disproportionality is inconsequential because of the nature and operation of the District's rules. Unlike many rules challenged in disparate impact cases, the rules at issue here sort the entire, relevant population into two exclusive and exhaustive subgroups – public housing residents who are subject to the challenged rules and all other customers who not subject to those rules. In other words, every water customer fits within one subgroup, but never the other. Each subgroup is a known quantity because PCHD and the District produced records providing demographic data for each member of each subgroup.

25

**2.     Plaintiffs established a prima facie case of disparate impact.**

a.     Plaintiffs identified specific rules causing the
       disproportionately discriminatory effect.

As instructed by *Inclusive Communities* and *Wards Cove*, plaintiffs started
their disparate impact analysis by identifying three specific rules – the service
deposit rule, the late payment/timely payment rule, and the balance payoff rule –
that caused the discriminatory effect. By identifying these rules with precision,
plaintiffs not only identify the District's conduct that discriminates, they also
obviate many of the subsidiary disputes that confound disparate analysis. The rules
define the relevant population on which to measure disproportionate impact. The
temporal scope of that population is determined by the period during which a rule
was enforced. The geographic scope of the relevant population is determined by
the district's boundaries, including the Edwards Circuit project served by the
District.

b.     Plaintiffs identified the correct population and subgroup.

Here, that population is the District's residential customers, persons who
applied for or obtained water service. The District applied the challenged rules to
each applicant and customer. Every application for water service started with the
District's determination whether the customer occupied public housing or not. A

26

customer may start in public housing at Edward Circle, then move to non-public housing within the District's boundaries. Pursuant to the District's rules, that same customer is classified and treated very differently based solely on the changing nature of her housing. Thus, plaintiffs appropriately presented statistical evidence regarding the demographics of Edward Circle residents and used the District's total customer base as the relevant comparison population.

Dr. Elizabeth Wentz, Arizona State University Dean of Social Sciences, using data from the District itself and the Pinal County Housing Department, tabulated the demographic distribution of households in Edwards Circle and the District's customer census, computed the disparity between the proportion of Whites, African Americans, Native Americans, Hispanics, and female-household-heads with children in each group. 2-ER-198-203. She also identified the demographic distribution of households on the PCHD waitlist. Id.

### c. Plaintiffs measured the discriminatory effect of the District's rules on that population.

The demographic distribution of those households showed that the Edwards Circle households are disproportionately African American (38.9%) as compared to the District's customers as a whole (2.9%), disproportionately Native American (16.7%) as compared to the District's customers as a whole (2.3%), and

27

disproportionately headed by single females with children (89.0%) as compared to the District's customers as a whole (34.3%). 2-ER-199-201 (Tables 3 & 4). While White, non-Hispanics make up 45% of the heads of household in the District's service area, they make up only 11.1% of the heads of household at Edwards Circle. Id. Similar statistical disparities exist when the District's customer population is compared to the household population on the PCHD's waitlist which is 13% African American and 8.8% Native American. 2-ER-199-201 (Tables 2 & 4). Although data for the number of female-headed households with children on the PCHD waitlist is not available, data on the total households in PCHD housing reflects that 73% of households are headed by females with children. Id.

These statistics establish that the Edwards Circle residents, as well as the pool of potential future tenants, is significantly more like to be made up of African Americans, Native Americans, and female-headed households with children than the District's customer base. 2-ER-201-203. To ensure that those statistical disparities are not the product of random variations in the data (i.e., chance), Dr. Wentz also computed a Chi-squared test statistic for each disparity and reported that the disparities between the District's customer population and the District's public housing customers are statistically significant on the basis of race (African American), national origin (Native American) and gender/familal status (female-

28

headed households with children). 2-ER-201-203.

These statistics establish a discriminatory effect on the basis of race, national origin, and gender/familal status (female-headed households with children) whether utilizing a disproportional representation analysis or a disproportionate effect analysis. *Hallmark*, 466 F.3d at 1286. African Americans, Native Americans, and female-headed households with children are disproportionately represented in the Edwards Circle population as compared to their smaller proportion in the District's entire customer base. African Americans, Native Americans, and female-headed households with children are also disproportionately affected because they make up a greater percentage of those subject to the District's rules.

The District did not offer any refutation to Dr. Wentz's findings. 4-ER-623-624. Nor could it. Dr. Wentz's straightforward analysis uses case-specific populations that were directly subject to the challenged the District's practices. She confirms her findings by performing the same analysis on the PCHD waitlist. The demographic distribution within the District's customer population is supplied directly from the District's own data. 2-ER-199-201. The demographic data of the District's public housing customers (Edwards Circle tenants) is supplied directly from PCHD. 2-ER-198. Nonetheless, the District argued – and the district court

agreed – that plaintiffs could not establish a prima facie case as a matter of law.

> **3.  Plaintiffs demonstrated robust causation between the District's rules and disparate impact on protected classes, a requirement that does not call for a showing that the District caused public housing residents to be disproportionately African American, Native American or female-headed households with children.**

To grant summary judgment against plaintiffs, the district court disregarded the Supreme Court's instruction in *Wards Cove* about the central importance of faithfully identifying the rule causing a disparity and misconstrued the Court's discussion of robust causality in *Inclusive Communities*. These errors lead the district court to reach an untenable conclusion that "robust causality" required plaintiffs to prove that the District's water service rules caused a disproportionate number of African Americans, Native Americans, and female-headed households with children to be public housing residents at Edwards Circle. 1-ER-19-21. To meet that burden, plaintiffs would have had to demonstrate that the District controlled who obtained a spot on PCHD's waitlist, received an offer from PCHD to apply for an Edwards Circle dwelling, and met PCHD's qualifications for tenancy – events obviously beyond any water district's control. The rules challenged here did not even come into play until the prospective public housing tenant applied for water service and were completely within the District's control. As framed by the district court, robust causality turns on the impossible, calling on

plaintiffs to prove an absurdity: That a water district was responsible for the demographic make-up of a public housing complex. Robust causality – as commonly understood[2] – and explained by the Supreme Court in *Inclusive Communities*, does not ask the impossible or demand the absurd.

*Inclusive Communities* held that disparate impact claims are cognizable under the FHA. 576 U.S. at 542. That simple holding arose from a complex case. There, the plaintiff raised a "novel theory of liability," specifically that the Texas Department of Housing and Community Affairs had caused or perpetuated segregated housing patterns in Dallas by its disproportionate allocation of federal low-income housing tax credits, granting too many credits to projects seeking to develop housing in predominantly black inner-city areas and too few to projects in predominantly white suburban neighborhoods. *Inclusive Communities*, 576 U.S. at 525-26. The plaintiff pointed to Dallas's deeply rooted, segregated housing patterns and claimed that the state's allocation of tax credits caused or increased that segregation. But, as Justice Kennedy pointed out for the Court, there could have been many causes of that disparity, including the decisions of private developers and priorities of housing authorities, thus the need to find a "robust"

---

[2]"Robustness" is a term of art used in statistics. It describe a "statistic or procedure that does not change much when data or assumptions are modified slightly." *Reference Manual on Scientific Evidence*, 295 (3rd. 2011).

causal connection between the defendant's policy and the racial disparity the plaintiff alleged. *Id.* at 541-42.

Clearly, the Texas Department of Housing and Community Affairs did not create the long-standing, deeply rooted segregated housing patterns in Dallas that the plaintiff aimed to redress. The plaintiff's claim assumed tax allocation decisions bore direct responsibility for a much larger, deeply entrenched, historical pattern of segregation. On its face, the effect – segregated Dallas – seemed much too complex and sweeping for the purported cause – the Department's tax allocation decisions. It was these unique facts that lead Justice Kennedy to write that "robust causality" must exist between an identified policy (tax allocation decisions) and the disparate impact (segregated Dallas) in order to protect a defendant (Texas Department of Housing and Community Affairs) "from being held liable for racial disparities they did not create." Id. at 542 (citing *Wards Cove*, 490 U.S. at 653.

This case bears little resemblance to the facts or claims in *Inclusive Communities*. Unlike the policy challenged in *Inclusive Communities*, the rules at issue here do precisely and directly what the District intended, imposing significantly greater burdens on public housing tenants based solely on their status as public housing tenants. But the district court failed to examine the scope,

32

nature, terms and application of each of the challenged rules. With that misstep, it failed to define the parameters of the relevant population for purposes of comparison, which Dr. Wentz did in her report.

Once the district court shorted the threshold determination in any disparate impact case – the scope, nature, terms and application of each of the challenged rules – it lost sight of the relevant population for comparison. It defined the relevant population in even broader terms than, say, long-entrenched housing segregation in a major city; instead, plaintiffs were called upon to explain how the District's customer rules accounted for the prevalence of protected class members in public housing, an assignment as sweeping as the history of the United States.

The district court's logic cannot be squared with other disparate impact cases that followed the same analysis applied by plaintiffs here. For instance, in *Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir.1988), this Court found a discriminatory impact arising out of a city's refusal to permit construction of housing for residents displaced by freeway development where "[o]f the persons who would benefit from the state-assisted housing because they are low income displacees, two-thirds are minorities." There the plaintiffs were not required to show that the city caused the displacees to be predominantly minorities.

In *Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 142 (3d Cir. 1977), the

Third Circuit found that the discriminatory impact "could hardly be clearer" where a city's refusal to allow construction of a low-income housing project denied opportunities to persons on the public housing waiting list, 95% of whom were Black or minority. There, plaintiffs were not required to show that the city caused persons on the wait list to be predominantly minorities. Likewise, the Second Circuit in *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir.), aff'd in part sub nom. *Town of Huntington, N.Y. v. Huntington Branch, N.A.A.C.P.*, 488 U.S. 15 (1988), found a disparate impact arising out of the refusal to allow the construction of Section 8 subsidized housing where 60% of the families holding Section certificates and 61% of those on the waiting list for certificates were minorities. There, too, the plaintiffs were not required to show that the town caused persons on the Section 8 waitlist to be predominantly minorities.[3]

Last, in *Charleston Housing Authority v. U.S. Dept. of Agriculture*, 419 F.3d 729 (8th Cir. 2005), a housing authority decided not to renew its Section 8

---

[3] A factor of "crucial importance" in the Supreme Court's recognition of disparate impact liability in *Inclusive Communities* was that all nine Courts of Appeals to address the question prior to passage of the Fair Housing Amendments Act of 1989 had concluded that disparate impact was a cognizable method of proof. 576 U.S. at 535-36 (citing *Rizzo, Huntington*, and *Halet v. Wend Investment Co.*, 672 F.2d 1305, 1311 (9th Cir. 1982)). This Court's decision in *Keith* also predated the 1989 amendments.

contract with the USDA for one of its apartment complexes and to demolish that complex. *Id.* at 733-34. Of the 47 occupied units in the complex, 46 were occupied by African American tenants. *Id.* at 733. The Eighth Circuit affirmed the district court's finding that the plaintiffs had established a prima facie case of disparate impact in violation of the FHA. *Id.* at 741 ("The Tenant's proof established a disproportionate impact upon minority class members whether we examine the relevant waiting list population, . . . or the actual Charleston Apartment Tenants."). Like other circuit cases, the plaintiffs in *Charleston* were not required to show that the housing authority caused minorities to be the primary occupants of the building to be demolished.

In support of its ruling, the district court pointed to this Court's unpublished memoranda in the two related cases *City of Los Angeles v. Wells Fargo & Co.*, 691 Fed. App'x 453 (9th Cir. 2017), and *City of Los Angeles v. Bank of Am. Corp.*, 691 Fed. App'x 464 (9th Cir. 2017). Neither of those decisions provided the district court with guidance or precedent to reach its ruling here.[4] In those cases the City of Los Angeles alleged that banks violated the FHA by engaging in lending

---

[4]Pursuant to Circuit Rule 36-3, "[u]npublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion," although they may be cited in accordance with Rule 32.1 of the Federal Rules of Appellate Procedure. 9th Cir. R. 36-3(a) and (b).

discrimination by targeting certain borrowers with high cost loans that were likely to result in default which in turn caused the City to lose tax revenue and increase spending on municipal services. *See City of Los Angeles v. Wells Fargo & Co.*, No. 2:13-CV-09007 ODW-RZX, 2015 WL 4398858, at *1 (C.D. Cal. July 17, 2015). The policies proffered by the City of Los Angeles as the cause of its injuries were that "(1) Wells Fargo's compensation scheme provided incentives for its loan officers to issue higher-amount loans, (2) Wells Fargo's marketing targeted low-income borrowers, and (3) Wells Fargo failed to adequately monitor its loans for disparities." *Wells Fargo*, 691 Fed. App'x at 454-55; *Bank of America*, 691 Fed. App'x at 465. But, as the panel observed, the gap between the first two banking practices and the maladies attributed to those policies was too remote or – in the word of *Inclusive Communities* – Los Angeles could not show a that they "causally connected in a 'robust' way to the racial disparity, as they would affect borrowers equally regardless of race, and the third is not a policy at all." *Wells Fargo*, 691 Fed. App'x at 455; *Bank of America*, 691 Fed. App'x at 465. For sure, the case at bar – given the nature of the challenged rule and tightly drawn relevant population – bears little resemblance to the memorandum dispositions cited by the district court.

Although the district court professed to follow those two memorandum

36

dispositions, in truth its analysis was drawn directly from the Fifth Circuit's recent decision in *Inclusive Communities Project, Inc. v. Lincoln Property Co.*, (*Lincoln Property*), 920 F.3d 890, 903-04 (5th Cir. 2019), cert. denied, 140 S. Ct. 2506 (2020). See 1-ER-19. *Lincoln Property* is a true outlier, unmoored from any other authority and explicitly disavowed by HUD as recently as last week as discussed below. In *Lincoln Property*, the plaintiffs challenged the refusal of several large landlords with complexes in predominantly white areas of Dallas to accept Section 8 vouchers, arguing that the refusal had a disparate impact on protected classes because voucher-holders and those on the waiting list were predominantly African American. 920 F.3d at 895-98.

Over a vigorous dissent,[5] a sharply divided Fifth Circuit concluded that the complaint failed to state a claim for disparate impact because no "robust causation" existed:

> Neither the aforementioned "city-level data" nor the "census-level data" cited by ICP supports an inference that the implementation of Defendants-Appellees' blanket "no vouchers" policy, or any change

---

[5]*See Lincoln Property*, 920 F.3d at 924 (Davis, J., dissenting) (to require that the plaintiffs prove that the defendant's "no-voucher" policy caused Black persons to be the dominant group of voucher holders in the Dallas metro area "would render disparate impact liability under the FHA a dead letter"); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 930 F.3d 660, 666 (5th Cir. 2019) (Haynes, J. [joined by six judges] dissenting from denial of rehearing en banc) (same criticism).

therein, caused black persons to be the dominant group of voucher holders in the Dallas metro area (or any of the other census areas discussed by ICP). Similarly, ICP alleges no facts supporting a reasonable inference that Defendants-Appellees bear any responsibility for the geographic distribution of minorities throughout the Dallas area prior to the implementation of the "no vouchers" policy. Indeed, ICP pleads no facts showing Dallas's racial composition before the Defendants-Appellees implemented their "no vouchers" policy or how that composition has changed, if at all, since the policy was implemented.

*Lincoln Property*, 920 F.3d at 907.

No other circuit has joined the Fifth Circuit in framing disparate impact in such an alien way. Since *Inclusive Communities*, other circuits have continued to apply longstanding disparate impact methodology in assessing whether there exists "robust causality." In *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*, 759 F. App'x 828, 835 (11th Cir. 2018), for example, the Eleventh Circuit found that the plaintiff property owner had failed to show disparate impact when it merely alleged that the City had applied a policy (applicable city-wide) to the plaintiff's property in which 75% of the tenant population were racial minorities. Nonetheless, consistent with the robust causality requirement of *Inclusive Communities*, the court held that the plaintiff might have been able to present a prima facie case had a "citywide comparison demonstrated that a disproportionate percentage of racial minorities in multifamily properties were impacted across the

38

city" by the City's policy as compared to non-minorities living in such properties. In *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 434 (4th Cir. 2018), cert. denied sub nom. *Waples Mobile Home Park Ltd. P'ship v. de Reyes*, 139 S. Ct. 2026 (2019), the Fourth Circuit concluded that "determining whether a plaintiff made a prima facie case of disparate-impact liability requires courts to look at whether a protected class is disproportionately *affected* by a challenged policy."

The long-established standing understanding regarding the nature of the nexus between a challenged policy and its discriminatory effect is also evidenced in HUD's newly published Final Rule on Implementation of the Fair Housing Act's Disparate Impact Standard, StatAdd:11-13, amending its 2013 disparate impact rule, 24 C.F.R. § 100.500; StatAdd:9-11. In the 2020 Final Rule, HUD specifically rejected the rationale relied on by Fifth Circuit in *Lincoln Property* – and by the district court here. 85 Fed. Reg. 60288 (Sept. 24, 2020). In discussing its amendments to the disparate impact regulation 24 C.F.R. § 100.500, HUD addressed commenters' concerns over *Lincoln Property*'s "finding that it is insufficient to plead and prove that a defendant's challenged policy has a discriminatory impact based on race because of its interaction with pre-existing societal disparities if the defendant is not responsible for the underlying societal

39

disparities." 85 Fed. Reg. at 60313. HUD acknowledged the commenters' concerns with *Lincoln Property*'s formulation of disparate impact, stating that HUD "does not intend to endorse this decision." 85 Fed. Reg. at 60313. Instead, HUD affirmed that to prove disparate impact "a plaintiff must show that the policy or practice disproportionately affects members of protected class compared to similarly situated non-members." 85 Fed. Reg. at 60313.

### 4. The district court erred in finding the District's rules to be based on income.

The district court erroneously construed the District's rules to be a "race-neutral policy" that was "targeted toward those with low incomes" and "therefore ended up affecting a disproportionate share of protected-group members." 1-ER-20. That description of the District's rules is inaccurate. The District targeted the public housing residents at Edward Circle not because of their income but because they lived at Edwards Circle. It was their status as County tenants – not their income – that triggered application of the policies. Therefore, this is not a case where a neutral rule turns on income and therefore negatively affects poor people who are disproportionately made up of protected-class members.

//

//

5.    **The district court erred in concluding that no disparate impact existed because 100% of the residents of Edwards Circle were subject to the District's policies.**

The district court also concluded that the District's policies were not

discriminatory because they affected all the residents of Edwards Circle equally,

no matter their race, national origin, or composition of their households. That

conclusion goes against decades of authority measuring discriminatory effect in

FHA cases. For instance, in neither *Keith*, *Rizzo* nor *Huntington*, cited in Part A.3

above, did the fact that the challenged decision also negatively affected White

persons eligible for the assisted housing negate the disparate impact shown. In

*CCCI*, this Court rejected the contention that the plaintiffs' statistics showing

disparate impact were inconsequential because the affected group also included

White citizens who "obviously have not been treated any differently from the

Latinos" in the group. 583 F.3d at 704. And, in *Mt. Holly Gardens Citizens*

*Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 383-84 (3d Cir. 2011), the

Third Circuit specifically rejected as "specious" the premise relied upon by the

district court here – that proof of disparate impact failed where 100% of the

minorities and 100% of the non-minorities would be similarly affected by the

challenged policy. Instead, "a disparate impact inquiry requires us to ask whether

minorities are disproportionately affected" by the challenged policy. *Id.*[6] In this case, plaintiffs made that showing.

### 6. Plaintiffs raised a triable issues of fact whether the District had a legally sufficient justification for its rules and whether a less discriminatory alternative was available.

In this case, the District imposed "artificial, arbitrary, and unnecessary barriers" to its public housing customer's access to the water hookup necessary for them to obtain housing. *Inclusive Communities*, 576 U.S. at 543 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). It also imposed punitive terms on those customers as described above. Those policies disproportionately injured African American, Native American and female-headed households with children. The City may rebut plaintiffs' proof of disparate impact by "supply[ing] a legally sufficient, nondiscriminatory reason." *CCCI*, 583 F.3d at 711. Here, plaintiffs raised triable issues of fact as to whether the District had legally sufficient justifications for its rules.

The District contends that its public housing rules are "necessary to protect

---

[6]The Supreme Court granted certiorari in *Twp. of Mount Holly, N.J. v. Mt. Holly Gardens Citizens in Action, Inc.*, 590 U.S. 904 (2013), on the question whether disparate impact claims are cognizable under the FHA. The writ of certiorari was dismissed pursuant to the agreement of the parties. 571 U.S. 1020 (2013) (citing Supreme Court Rule 46.1).

against the losses suffered by it from delinquent and open accounts that would go unpaid. The District has a legitimate interest in collecting sufficient funds to operate the water system and provide services." 2-ER-207, 211-218; 3-ER-379-380, 384. While the District's stated interest – fiscal solvency – is no doubt a very important interest, the public housing rules challenged here are arbitrary, unnecessary, and based on hypothetical and speculative assertions.

a.   No rational basis or cogent analysis supports the deposit increase imposed by the District on its public housing customers.

First, the total outstanding balance owed by public housing customers was de minimis. The District's "delinquency report," dated January 2016, states that former public housing customers owed the District the sum of $439.42 in outstanding balances. 2-ER-220-233. Based on that report, the total sum for the outstanding balance is less than 0.0002% ($439 ÷ $2,400,000 = 0.00018) of the District's total net assets, as reported by MDWID in 2014 and 2015. 2-ER-106-110. For fiscal year (FY) 2014, the District's total operating revenue exceeded its total operating expenses. 2-ER-155 (MDWID Responses to Request for Admission No. 23). As a result, the District's budgets for FY 2014-2015 and FY 2015-2016 reflect large carryover amounts, $100,000 and $135,000, respectively. 2-ER-104-113. Between 2014 and 2017, the total amount of customer service

43

deposits held by the District grew each year (2014=$8,839; 2015=$10,144; 2016=$11,744; 2017=$16,694). 2-ER-220-233. The outstanding public housing customer balances were 4% ($493 ÷ $11,744 = 0.041) of the total deposits held by the District in 2016. 2-ER-220-233. Thus, the balance owed by public housing customers is so small it could have had no material affect on the District's fiscal solvency.

Second, the basis for the 2015 increase in connection fees from $100 ($80 deposit; $20 hookup fee) to $200 ($180 deposit; $20 hookup fee) for the District's public housing customers was entirely speculative:

> Joe does not think PCH will agree to pay the current delinquent amounts and will continue to have the new tenants pay it off before moving in. He suggested an increase to $180 for the deposit amount. Joe motioned to approve an increase to $180 PCH Deposit for new tenants, Don 2nd, all in favor; motion carried.

2-ER-147-148. The decision to increase the cost to public housing customers by $100 is so lacking in any basis that it appears punitive and certainly arbitrary. The District has never conducted an analysis of the delinquency rates between renter households and owner-occupied households or between geographic areas within its boundaries. 4-ER-619.

Last, the District's service deposit rule is an outlier. Joe Hoover, the District's Rule 30(b)(6) designee, acknowledged that he was unaware of any other

44

water district that imposed different service deposit amounts on public housing customers versus non-public housing customers. 3-ER-387.

> ### b. No rational basis exists for the District's rule requiring subsequent public housing tenants to pay off balances owed by prior tenants.

The District has no legitimate interest in requiring public housing residents to clear the debts of vacating public housing residents as a precondition to obtaining water service. This Court has held that a municipal policy of refusing to provide water service to a new tenant because of a prior tenant's unpaid water bill has no rational basis and violates equal protection. *O'Neal v. City of Seattle*, 66 F.3d 1064, 1068 (9th Cir. 1995). Other Circuits are in accord. *See Winston v. City of Syracuse*, 887 F.3d 553, 563 (2d Cir. 2018) ("requiring a tenant without any legal obligation for a landlord's unpaid bill to pay that bill to retain or restore water service fails rational basis review"); *Golden v. City of Columbus*, 404 F.3d 950, 962 (6th Cir. 2005) (same); *Sterling v. Vill. of Maywood*, 579 F.2d 1350, 1355 (7th Cir. 1978) (same); *Davis v. Weir*, 497 F.2d 139, 144 (5th Cir. 1974) (same). "Pursuing payment from the prior tenant and the landlord would be rationally related to the City's goal; refusing service to an unobligated new tenant is not." *O'Neal*, 66 F.3d at 1064.

The District's claim that its policy is justified because it cannot satisfy the

vacating tenant's water debt by levying against the County does not change the result:

> The fact of the landlord's non-payment is irrelevant, because the City cannot force an individual without a legal obligation to pay the bill of another. As a result, the City cannot point to the landlord's non-payment to satisfy rational-basis review under the Equal Protection Clause.

*Winston*, 887 F.3d at 565; *accord Golden*, 404 F.3d at 962.

Against this backdrop, it comes as no surprise that the District's rule also violates industry practice. The Arizona Corporations Commission ("ACC") regulates most water districts in the state. ACC guidelines explicitly and broadly bar a water district from requiring new customer to pay off a prior occupant's outstanding balance as a condition of obtaining water service. 2-ER262-263 (utility must provide service despite previous tenant's balance). Although not regulated by the ACC, the District declared to PCHD that it follows ACC guidance when PCHD challenged the District's enforcement of this rule against public housing tenants. See 2-ER-256-260 (District advised PCHD that it follows ACC guidance).

        c.    <u>The District's rule threatens public housing customers only with loss of their service deposits for late payment even though the problem is not limited to public housing customers.</u>

The District admits that between 2012 and 2016, there were public housing

customers who *were not* delinquent on their water bills and that during that same period of time there were non-public housing customers who *were* delinquent on their water bills. 2-ER-156-157 (MDWID's Responses to Requests for Admission Nos. 31-41). If the objective of this District rule – threatening loss of service deposits for tardy payment – truly aims to advance the District's interest in fiscal solvency, then the rule is irrationally over-inclusive and under-inclusive and unfairly so. Public housing customers account for only 20 of the District's 312 hookups. The District failed to provide comparative dates on delinquency rates between public housing and non-public housing customers. Nonetheless, the potential risk of loss is 15.6 (312 ÷ 20) times greater for the favored subgroup (non-public housing residents) who are not subject to the District's late payment rule. By contrast, the District admits that among the relatively small subgroup of 20 public housing customers, some stay current on their water bills. Through no fault of their own, these public housing customers, like Peña who has stayed current on her water bills for two decades, risk loss of their deposits if – due to events beyond their control – they pay late during one year of their water service with the District. This penalty accrues to the detriment of public housing tenants, even though they – like every other customer – are also subject to the District's 1.5% late fee penalty.

### 7. Plaintiffs presented evidence establishing triable issues on whether the District had less discriminatory alternatives.

If the defendant satisfies its burden of coming forward with a legally sufficient justification, the burden shifts back to the plaintiff to show that the defendant's interests could be served through a less discriminatory alternative. *Avenue 6E*, 217 F. Supp.3d 1040, 1048 (D. Ariz. 2017). As just discussed, the District cannot, as a matter of law, justify its rule that new public housing residents must pay the vacating resident's water arrearage, or its rule penalizing only public housing residents with the threat of losing their deposits because of late payments. See Parts A.6.b and A.6.c, above. With respect to the rule on the increased service deposit, plaintiffs raised triable issues as to whether the District's security deposit was a legitimate manner by which to promote its interest and whether the District's interests could have been served by a less discriminatory alternative.

Fundamentally, this action arose from a dispute between two governmental entities, the District and Pinal County, over their obligations. The District recognized as much in this action when it filed a crossclaim against Pinal County, 4-ER-815, 824, which it later dismissed, 4-ER-797, leaving only plaintiffs to pursue Pinal County in their first amended complaint, 4-ER-828, 835-843. Both the District and Pinal County had several widely accepted methods for resolving

their disagreement: They could have negotiated an intergovernmental agreement allocating the risk of loss between them. Ariz. Rev. Stat. § 11-952. The District could have requested a resolution by the County Board of Supervisors to order PCHD to pay any losses claimed by the District. Finally, as often occurs, either could have filed a declaratory relief action to settle their duties and obligations. Although the District and PCHD swapped accusations, none of these options was pursued by the District. 3-ER-366-368. Instead, it was easier for the District to impose discriminatory, punitive rules on the most powerless and marginalized members of the community, public housing tenants.

Other less discriminatory alternatives existed. 4-ER-680-681. First, one obvious solution is for the District to abolish its dual water rules and apply the same (lawful) rules to all customers. If the rules applied to public housing tenants are truly advantageous, those advantages grow exponentially if the same rules are applied to all customers. Second, the District could seek to collect unpaid balances from the public housing customers who are responsible for those delinquencies, an alternative recommended by PCHD to the District. 3-ER-485. Third, since the District admits that late payment is not limited to public housing tenants it could adopt a new, uniform security deposit rule – only slightly higher than that presently charged non-public housing residents. Fourth, the District

49

could determine the amount of any security deposit based on the customer's past

performance or, lacking that information, any one of the dozens of readily

available credit rating instruments easily available on the internet. Any one of

these alternatives would achieve the same or better protection for the

District with a much less discriminatory effect than the rules challenged in this

action.

**B.    The district court erred in granting summary judgment in the District's favor on disparate treatment because that claim was at issue throughout the case and plaintiffs raised a triable issue of fact on intent.**

**1.    The district court erred in finding that plaintiffs failed to raise a disparate treatment claim.**

The district court found that plaintiffs were foreclosed from opposing the

District's summary judgment  motion with evidence of disparate treatment because

plaintiffs had failed to raise a disparate treatment claim in their complaint. 1-ER-

23-24. Specifically, the district court relied on *Coleman v. Quaker Oats Co.*, 232

F.3d 1271, 1292-93 (9th Cir. 2000), to hold that plaintiffs' complaint failed to put

the District on notice that plaintiffs intended to prove disparate treatment by

failing to include an allegation that discrimination was a "motivating factor"

behind its policies. 4-ER-24. That conclusion was erroneous because, unlike in

*Coleman*, the District here was on notice that plaintiffs alleged disparate treatment.

Plaintiffs' initial complaint filed in 2017 alleged that the District "provides municipal services differently on the basis of race, color, national origin, sex, familial status and disability in violation of the federal and state fair housing laws" and sought relief for violations of the FHA "arising out of the District's unlawful discrimination in the provision of residential water service and the terms and conditions thereof." 4-ER-858; 4-ER-867; 4-ER-843. Plaintiffs alleged facts concerning the discriminatory fees assessed on public housing residents, and no other residents in the District. 4-ER-860, 865-866; see also 4-ER-830, 841. Plaintiffs further alleged that the District was "aware of the racial demographics of its public housing customers" since the application for water service itself directs applicants to indicate whether their race. 4-ER-863, ¶ 21; 4-ER-833, ¶ 22.

The District acknowledged that it was on notice that plaintiffs raised a claim for disparate treatment. Its answer raised affirmative defenses, including that "[d]iscrimination was not a motivating factor in any decisions that the District made with respect to the Plaintiffs." 4-ER-855; 4-ER-823. Moreover, in the joint case management plan filed shortly after the District answered plaintiffs' complaint, the parties' statement of issues in dispute included a stand alone practice of "[e]nacting or enforcing a policy that has actually or predictably results in a disparate impact" because of protected class. 4-ER-846. The plan also

51

identified as disputed whether the public housing residents' protected-class status "was a motivating factor" in the District's commission of discriminatory housing practices. 4-ER-846; see also 4-ER-806 (second joint plan); 4-ER-793-794 (joint filing stating that plaintiffs' settlement with Pinal County would potentially "eliminate the District's policies and procedures that Plaintiffs claim singled-out public housing tenants for *disparate treatment* in the provision of water services" [emphasis added]).

Based on the complaints and answers and the parties' joint filings, there is no question that the District was on actual notice that plaintiffs intended to proceed to prove their discrimination claims utilizing both disparate impact and disparate treatment theories. Thus this case is easily distinguished from *Coleman* where the plaintiffs gave the defendant "no notice either in the complaint, in documents submitted with the complaint, or in any document prior to their motions for summary judgment that they intended to argue [a disparate impact] theory." *Coleman*, 232 F.3d at 1294 n.8.

## 2. The district court erred in finding that plaintiffs failed to raise a triable issue of fact supporting their disparate treatment claim.

Although it ruled that plaintiffs failed to raise a disparate treatment theory in their complaint, the district court went on to find that plaintiffs had failed to raise a

triable issue to support a finding of disparate treatment. 1-ER-24-25. That conclusion was erroneous.

To establish a prima facie case of disparate treatment, a plaintiff must "'simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely that not motivated' the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Avenue 6E*, 818 F.3d at 504 (quoting *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1158 (9th Cir. 2016)). A plaintiff does not have to prove that the discriminatory purpose was the sole purpose of the challenged action, but only that it was a "motivating factor." *Arlington Heights v. Metro. Hous. Corp.*, 429 U.S. 252, 266 (1977).

Whether a discriminatory purpose motivated a defendant is evaluated "by examining the events leading up to the challenged decision and the legislative history behind it, the defendant's departure from normal procedures or substantive conclusions, and the historical background of the decision and whether it creates a disparate impact." *Avenue 6E*, 818 at 503 (internal citations omitted). These elements are non-exhaustive and a plaintiff need not establish any particular element in order to prevail. *Id.* In addition, that an action will have a foreseeable disparate impact on a protected group is relevant evidence to prove the existence

of discriminatory intent. *Columbus Bd. of Ed. v. Penick*, 443 U.S. 449, 464-65

(1979); *Diaz v. San Jose Unified Sch. Dist.*, 733 F.2d 660, 663 n.1 (9th Cir. 1984)

("where, as here, the adverse consequences are clearly identified and repeatedly

articulated to the decisionmaking body, the inevitability of the adverse effects

provide a strong inference of illegitimate intent"). Likewise, the availability of less

discriminatory alternatives may support the inference of discriminatory intent.

*Greater Birmingham Ministries v. Sec'y of State for Alabama*, 966 F.3d 1202,

1231 (11th Cir. 2020).

Here, plaintiffs' evidence raised the inference of discriminatory intent. The

District's treatment of public housing tenants reflected a departure from its normal

procedures. It had never imposed a different service deposit on any group of

comparable users other than public housing residents. 3-ER-379; 4-ER-611.

Although PCHD explicitly protested to the District that its rules targeting only the

public housing residents violated the fair housing laws, 2-ER-265, 272-285, 295,

the District claims it never considered whether the rules would be discriminatory.

3-ER-369. This despite the fact that the District was fully aware that the Edwards

Circle residents were overwhelmingly minorities and single women with children

and that their failure to obtain a District water connection would deprive them of

their housing. 3-ER-536-541, 574-575; 4-ER-609-610. Nor was it lost on the

District's board members that PCHD public housing clients were different from the majority of the District's customers. 2-ER-199-201 (Tables 2-4). Joe Hoover, the District's vice-chair and sponsor of the motion to increase deposits on public housing customer in 2015, blamed PCHD for the District's situation, concluding his deposition: "I don't think (PCHD is) as accountable as they should have been for their property, for managing the influx of people and tenants and that type of thing." 3-ER-392. As demonstrated by the District's own records and illustrated in Dr. Wentz's report, the "influx of people" that Hoover complained of are persons of a much different demographic than the rest of the District's customers. The District also singled out the public housing residents for what can only be described as punitive rules requiring them personally to clear the debts of prior tenants and conditioning return of their service deposits on making timely payments – conditions not imposed on any other customers. 2-ER-152.

At the very least, the District acted with reckless disregard as to whether its rules were violating the fair housing rights of its public housing customers. Under other federal statutes a violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited" by federal law. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985) (ADEA); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (FLSA).

The word "willful" is considered synonymous with such words as "voluntary," "deliberate," and "intentional." *McLaughlin*, 486 U.S. at 133. Here, plaintiffs raised a genuine issue of material fact whether the District imposed special rules on public housing residents with reckless disregard as to whether doing so violated the FHA.

Taken as whole, the evidence of the District's treatment of its public housing customers, after an explicit warning that it was violating fair housing law, is sufficient to raise an inference that one motivating factor for its conduct was because those customers were disproportionately African American, American Indian, and single mothers with children, unlike the District's "regular" customers. 2-ER-165-166.

Once a plaintiff establishes a prima facie case, "summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a [discrimination claim] is the elusive factual question of intentional discrimination." *Harris v. Itzhaki*, 183 F.3d 1043, 1051 The same facts establishing the prima facie case may be used to establish pretext. *Id.* Those facts raise a triable issue of fact regarding the District's motivation, requiring reversal of the judgment.

//

56

## CONCLUSION

For the forgoing reasons, plaintiffs request that the Court reverse the

judgment of the district court and remand for further proceedings.

Dated: September 30, 2020.

Respectfully submitted,

BRANCART & BRANCART

/s/ *Elizabeth Brancart*
Attorneys for Plaintiffs-Appellants

57

## CERTIFICATE OF COMPLIANCE WITH
## FED. R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 32-1

I certify that pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit Rule

32-1, the attached appellants' brief is proportionately spaced, has a typeface of 14

points, and contains 12,678 words.

Dated:  September 30, 2020.

Respectfully submitted,

BRANCART & BRANCART

/s/ *Elizabeth Brancart*
Attorneys for Plaintiffs-Appellants

## STATEMENT OF RELATED CASES

Counsel is unaware of any related cases under Circuit Rule 28-2.6.