No. 20-15506

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SOUTHWEST FAIR HOUSING COUNCIL, INC., et al.,

Plaintiffs-Appellants,

v.

MARICOPA DOMESTIC WATER IMPROVEMENT DISTRICT,

Defendant–Appellee.

_____

On Appeal from the United States District Court
for the District of Arizona
The Honorable Dominic W. Lanza - Case No. 2:17-cv-01743-DWL

**BRIEF OF *AMICI CURIAE* NATIONAL FAIR HOUSING ALLIANCE INC.,
FAIR HOUSING COUNCIL OF OREGON, FAIR HOUSING ADVOCATES
OF NORTHERN CALIFORNIA, FAIR HOUSING CENTER OF
WASHINGTON, FAIR HOUSING COUNCIL OF RIVERSIDE COUNTY,
INC., FAIR HOUSING COUNCIL OF SAN DIEGO, FAIR HOUSING
FOUNDATION, HOUSING RIGHTS CENTER, INLAND FAIR HOUSING
AND MEDIATION BOARD, INTERMOUNTAIN FAIR HOUSING
COUNCIL, MONTANA FAIR HOUSING, NORTHWEST FAIR HOUSING
ALLIANCE, PROJECT SENTINEL, SILVER STATE FAIR HOUSING
COUNCIL, FAIR HOUSING NAPA VALLEY, AND LEGAL AID SOCIETY
OF HAWAI'I IN SUPPORT OF PLAINTIFFS-APPELLANTS**

Jeffrey L. Taren
JeffreyT@mhb.com
Jesse Wing
JesseW@mhb.com
MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, WA 98104
(206) 622-1604
*Counsel for Amici Curiae*

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

National Fair Housing Alliance Inc., Fair Housing Council of Oregon, Fair Housing Advocates of Northern California, Fair Housing Center of Washington, Fair Housing Council of Riverside County, Inc., Fair Housing Council of San Diego, Fair Housing Foundation, Housing Rights Center, Inland Fair Housing and Mediation Board, Intermountain Fair Housing Council, Montana Fair Housing, Northwest Fair Housing Alliance, Project Sentinel, Silver State Fair Housing Council, Fair Housing Napa Valley, and Legal Aid Society of Hawai'i are tax-exempt nonprofit organizations. None of the *amici* has any corporate parent. None of the *amici* has any stock, and therefore no publicly held company owns 10% or more of the stock of any of the *amici*.

# TABLE OF CONTENTS

Rule 26.1 Corporate Disclosure Statement ................................................................ i

Certificate Pursuant to Rule 29(a)(4)(E) ............................................................... iv

I.      STATEMENT OF INTEREST ...................................................... 1

II.     SUMMARY OF ARGUMENT ...................................................... 2

      A.      The History of Segregation and Racism in Public Housing
             In the United States is the Background for Examining
             Defendant's Dual Market Pricing Policies .......................................... 6

      B.      *Inclusive Communities* Did Not Change the Framework for
             Analysis of a Disparate Impact Case Under the Fair Housing
             Act Where Causality is Effectively Acknowledged ........................... 8

      C.      The District Court Misunderstood the Comparative Population
             to be Used in Analyzing Whether a Policy has a Disparate Impact . 16

      D.      Application of the Traditional Disparate Impact Framework to
             the Facts of this Case Mandates Reversal ......................................... 19

III.    CONCLUSION ........................................................................... 24

Certificate of Compliance with Fed. R. App. P. 32(a)(7)(C) ............................... 26

# TABLE OF AUTHORITIES

## Cases

*Arthur v. City of Toledo,*
  782 F.2d 565 (6th Cir. 1986) .............................................................. 9

*Ave. 6E Invs., LLC v. City of Yuma*,
  818 F.3d 493 (9th Cir. 2016) ................................................... passim

*Casa Marie, Inc. v. Superior Court of Puerto Rico,*
  988 F.2d 252 (1st Cir. 1993) .............................................................. 9

*City of Los Angeles v. Bank of Am. Corp.*,
  691 F. App'x 464 (9th Cir. 2017) .................................................... 15

*City of Los Angeles v. Wells Fargo & Co.*,
  691 F. App'x 453 (9th Cir. 2017) ............................................... 15, 16

*City of Oakland v. Wells Fargo,*
  2020 WL 5035815, * 1 (9th Cir. Aug. 26, 2020) ...................... 14, 19

*Garcia v. Spun Steak Co.*,
  998 F. 2d 1480 (9th Cir. 1993) ........................................................ 19

*Greater New Orleans Fair Hous. Action Ctr. v. HUD,*
  639 F.3d 1078 (D.C. Cir. 2011) ......................................................... 9

*Greater New Orleans Fair Hous. Action Ctr. v. Saint Bernard Parish*,
  641 F. Supp.2d 563 (E.D. La. 2009) ................................................ 22

*Griggs v. Duke Power Co.*,
  401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971) ................. 9, 11

*Grimm v. City of Portland*,
  971 F.3d 1060 (9th Cir. Aug. 21, 2020) .......................................... 15

*Hallmark Developers, Inc. v. Fulton Cty.,*
  466 F.3d 1276 (11th Cir. 2006) ................................................. 12, 22

*Huntington Branch, NAACP v. Town of Huntington,*
  844 F.2d 926 (2d Cir. 1988) ...................................................... 22, 23

*Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*,
    930 F.3d 660 (5th Cir. 2019) ............................................................... 14

*Jackson v. Okaloosa Cty*,
    21 F.3d 1531 (11th Cir. 1994) ............................................................... 9

*Keith v. Volpe*,
    858 F.2d 467 (9th Cir. 1988) ................................................... 9, 18, 21

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
    558 F.2d 1283 (7th Cir. 1977) ............................................................. 10

*Mhany Management, Inc. v. County of Nassau*,
    819 F.3d 581 (2d Cir. 2016) ................................................................. 13

*Mountain Side Mobile Estates P'ship v. HUD,*
    56 F.3d 1243 (10th Cir. 1995) ............................................................... 9

*Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*,
    658 F.3d 375 (3d Cir. 2011), *cert granted*, 570 U.S. 904, 133 S. Ct. 2824,
    186 L. Ed.2d 883 (2013), *cert dismissed*, 571 U.S. 1020, 134 S. Ct. 636,
    187 L. Ed. 2d 415 (2013) .................................................... 5, 9, 16, 17

*National Fair Housing Alliance v. Travelers Indemnity Co.*,
    261 F. Supp.3d 20 (D.D.C. 2017) ....................................................... 11

*R.I. Comm'n for Human Rights v. Graul*,
    120 F. Supp. 3d 110 (D.R.I. 2015) ..................................................... 18

*Resident Advisory Bd. v. Rizzo*,
    564 F.2d 126 (3d Cir. 1977) ................................................... 10, 17, 21

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
    903 F.3d 415 (4th Cir. 2018), *cert. denied sub nom.*
    *Waples Mobile Home Park Ltd. P'ship v. de Reyes*,
    139 S. Ct. 2026, 204 L. Ed. 2d 218 (2019) ....................................... 12

*Simms v. First Gibraltar Bank,*
    83 F.3d 1546 (5th Cir. 1996) ................................................................. 9

*Smith v. Town of Clarkton*,
    682 F.2d 1055 (4th Cir. 1982) ............................................................. 10

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015) ........................................................... passim

*Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565 (2d Cir. 2003) ............................................................ 21

*United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir. 1974) ...................................... 10, 21, 22, 23

*United States v. Mitchell,* 580 F.2d 789 (5th Cir. 1978) .......................................................... 10

*United States v. Starrett City Assocs.,* 840 F.2d 1096 (2d Cir.1988) ............................................................ 9

*Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989) .......................... 9, 10

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) .............................. 21

**Other Authorities**

Carol M. Motley and Vanessa Gail Perry, *Living on the Other Side of the Tracks: An Investigation of Public Housing Stereotypes*, 32 J. OF PUB. POL'Y & MARKETING 48 (2013) .................................. 20

CENTER ON BUDGET AND POLICIES PRIORITIES, *Arizona Federal Rental Assistance Fact Sheet* in FEDERAL RENTAL ASSISTANT FACT SHEETS (updated Dec. 10, 2019)...................................................................... 7

John Charles Boger, *Race and the American City: The Kerner Commission in Retrospect-an Introduction*, 71 N.C. L. REV. 1289 (1993) ......................................................... 12

Nat'l Low Income Housing Coalition, *Public Housing History* (Oct. 17, 2019) ...................................................................... 8

NATIONAL HOUSING LAW PROJECT, https://www.nhlp.org/resource-center/public-housng/ ....................................... 6

National Low-Income Housing Coalition, *Housing Spotlight*
Vol. 2, Issue 2, 1 (Nov. 2012)..............................................................7

PINAL CTY: HOUS. & WORKFORCE DEV. DEP'T, CONSOLIDATED
PLAN 2019-24, 2019-20 ANNUAL ACTION PLAN
(Pinal Cty. AZ, 2019),........................................................................7

REPORT OF THE NATIONAL ADVISORY COMMISSION ON
CIVIL DISORDERS 91 (1968)...............................................................12

RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR
GOVERNMENT SEGREGATED AMERICA (2017) ...............................6, 8

Right To The City, *We Call These Projects Home: Solving
The Housing Crisis From The Ground Up* 48 (2010),
https://righttothecity.org/wp-
content/uploads/2014/02/We_Call_These_Projects_Home-2.pdf .....................6

Robert G. Schwemm, *Fair Housing Litigation After Inclusive
Communities: What's New and What's Not*,
115 COLUM. L. REV. (2015)...............................................................11

Shivangi Bhatia, *To "Otherwise Make Unavailable": Tenant
Screening Companies' Liability Under the Fair Housing
Act's Disparate Impact Theory*,
88 FORDHAM L. REV. 2551 (2020)....................................................11

Stacy Seicshnaydre, *Disparate Impact and the Limits of Local
Discretion After Inclusive Communities*,
24 GEO. MASON L. REV. 663 (2017).....................................................
........................................................................................10, 11

U.S. CENSUS BUREAU, *ACS Demographic and Housing
Estimates* (2017) ...........................................................................25

U.S. CENSUS BUREAU, *Census Tract 1160 Maricopa AZ,*
CENSUS REPORTER (2018)..................................................................25

UNITED STATES CENSUS BUREAU, QUICK FACTS: *Pinal County*
(FPinal Cty. AZ, updated 2019),
https://www.census.gov/quickfacts/fact/table/pinalcountyarizona/LND110210.
........................................................................................................8

## CERTIFICATE PURSUANT TO RULE 29(a)(4)(E)

Pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure, counsel for *amici* certify that no party's counsel authored any part of this brief; no party nor counsel for any party contributed money intended to fund the preparation or submission of this brief; and no person other than one of the *amici* contributed money that was intended to fund the preparation or submission of this brief.

## I.   <u>STATEMENT OF INTEREST</u>

Amicus National Fair Housing Alliance Inc. ("NFHA") is a national organization dedicated to ending discrimination in housing.  Founded in 1988, NFHA represents approximately 80 private, non-profit fair housing organizations throughout the country.  Through education, outreach, policy initiatives, advocacy and enforcement, NFHA promotes equal housing, lending and insurance opportunities.  Relying principally on the Fair Housing Act ("FHA"), NFHA and its members have undertaken important enforcement initiatives in cities and states across the country.  Those efforts have contributed significantly to the nation's efforts to eliminate discriminatory housing practices.  As part of its enforcement activities, NFHA participates in federal and state court litigation involving claims under the FHA and files amicus briefs in which it has an interest.  With its extensive involvement in fair housing cases across the country, NFHA stands in a unique position to comment on the potential harmful effects of the erroneous interpretation of the FHA advocated by Defendants in this case.

Other *amici* are NFHA member organizations with operations based in jurisdictions within the Ninth Circuit.  These include Fair Housing Council of Oregon, Fair Housing Advocates of Northern California, Fair Housing Center of Washington, Fair Housing Council of Riverside County, Inc., Fair Housing Council of San Diego, Fair Housing Foundation, Housing Rights Center, Inland

Fair Housing and Mediation Board, Intermountain Fair Housing Council, Montana

Fair Housing, Northwest Fair Housing Alliance, Project Sentinel, Silver State Fair

Housing Council, Napa Valley Fair Housing, and Legal Aid Society of Hawai'i.

Their missions include resisting all forms of housing discrimination and ensuring

equal and affordable housing opportunities for all people within their operating

areas, including through private FHA enforcement in their own names and on

behalf of individuals.  Given the fair housing mission of these organizations, all the

*amici* have an interest in the Ninth Circuit's interpretation of the FHA.  Per FRAP

29(a)(2), *amici* have sought leave of this Court to file this brief after Appellee

Maricopa refused to consent.

## II.     SUMMARY OF ARGUMENT

Defendant Maricopa Domestic Water Improvement District (MDWID)

provides water services to customers in the county.  Defendant maintains a stated

policy of charging public housing residents security deposits that are more than

double the amount that they charge to non-public housing residents.  It also

adopted penalties for late payments for water service specific to public housing

residents and a policy requiring only these residents to pay any outstanding

balances owed by the dwelling's prior occupant.  For reasons tied to historical

discrimination, African American households, other persons of color, and families

with children are disproportionately represented in public housing units within

2

Pinal County and across the United States.  Defendant's dual housing market policy therefore impacts these minority households significantly more than non-minority households who live primarily in private, nonsubsidized housing.  This is exactly the kind of practice that Section 3604(b) of the Fair Housing Act was meant to prohibit by outlawing discrimination in the "provision of services…because of race, color, religion, sex, familial status or national origin."

In its decision, the District Court mistook this case as one involving an issue of causation, misinterpreted the requirements for proving causation, and then misread the statistical analysis applicable to this case under longstanding, binding precedent.

Contrary to the District Court's opinion below, the Supreme Court's *Inclusive Communities* "robust causality" language was no impediment to this case.  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015).  That language was not meant to create new limits on the applicability of the disparate impact doctrine, but instead was meant only to shine a light on the limits of existing court opinions holding that statistical disparities alone do not violate the FHA without causality traced back to the Defendant.  Here, causality is palpable since it was indisputably the Defendant who adopted the dual market security deposit pricing that disparately impacted the Plaintiffs.  No one else was responsible or had any

3

involvement in the adoption or implementation of the double pricing policy. The District Court misapplied *Inclusive Communities* in a manner that would effectively bar all disparate impact claims – the exact opposite holding of the case.

Accordingly, affirming the District Court's decision would undermine the Fair Housing Act's universally understood goals of eliminating racial disparities in housing, and it would conflict with decades of Supreme Court precedent applying disparate impact theory to housing (and employment) practices that disproportionately impact African American households.[1]

The District Court then compounded its mistaken conclusion that causation was an issue in this case, by holding that Plaintiffs had to show not only that the challenged policy harmed protected class residents, but also that it did not harm residents not in a protected class. Yet, in holding that there could be no disparate impact because there were some white households living within the Edwards Circle projects who were therefore adversely affected by the neutral policy, the District Court made the same mistake recognized in *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 383–84 (3d Cir. 2011), *cert granted*, 570 U.S. 904, 133 S. Ct. 2824, 186 L. Ed.2d 883 (2013), *cert dismissed*,

---

[1] Since causation is not at issue in this case, this Circuit need not weigh in on the split between the Fourth and Second Circuits and the Fifth Circuit over the meaning of robust causality as applied to statistical disparities caused by multiple factors that may increase the likelihood of foreclosure or adversely affect a municipality's tax base. These issues are not presented here.

571 U.S. 1020, 134 S. Ct. 636, 187 L. Ed. 2d 415 (2013).

The District Court's decision departed from well-settled Ninth Circuit and Supreme Court precedent underlying the framework of a disparate impact case. The purpose of disparate impact liability is to eradicate facially neutral practices that, resulting from social and historical disparities *unrelated to the neutral practice*, disproportionately harm protected class members. In this case, the Plaintiffs met their initial burden of showing that African-American and Native American residents, for reasons unrelated to their water bills, disproportionately lived in public housing and that as a result were adversely affected by the neutral policy of making public housing residents pay more than double the amount of security deposits in order to obtain water service. As a result, the District Court erred when it required the Plaintiffs to prove that the neutral practice actually caused the social or historical disparity in the sizes of the protected classes living in the public housing. This turns disparate impact liability on its head. If affirmed, this holding would effectively reverse the holding of *Inclusive Communities* in this Circuit, setting back disparate impact law by decades.[2]

---

[2] Because of its errors in analyzing the Plaintiffs' initial burden, the District Court never required that Defendant justify its actions by showing business necessity or by dispelling evidence that less discriminatory alternatives were effective, as required by *Inclusive Communities*.

**A.**     **The History of Segregation and Racism In Public Housing In The United States Is The Background for Examining Defendant's Dual Market Pricing Policies**

"The purposeful use of public housing by federal and local governments to herd African Americans into urban ghettos had as big an influence as any in the creation of our *de jure* system of segregation."  RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA, 17 (2017).

"For many people, the term public housing conjures up negative images of 'high-rise hell holes' filled with drug dealers, guns, and violence.  These stereotypes reflect racial biases that are deeply embedded in the American psyche and perpetuated by the mainstream media."  RIGHT TO THE CITY, WE CALL THESE PROJECTS HOME: SOLVING THE HOUSING CRISIS FROM THE GROUND UP 48 (2010), https://righttothecity.org/wp-content/uploads/2014/02/We_Call_These_Projects_Home-2.pdf.

The United States Housing Act of 1937 (42 U.S.C. § 1437) established the public housing program, which produced nearly 1.4 million units nationwide. NATIONAL HOUSING LAW PROJECT, https://www.nhlp.org/resource-center/public-housng/ (last visited on September 22, 2020).

Nearly two-thirds of public housing households are considered "extremely low income," with incomes below 30% of the AMI and an average annual income of $14,605.  NATIONAL LOW-INCOME HOUSING COALITION, *Housing Spotlight* Vol. 2,

Issue 2, 1 (Nov. 2012) (https://nlihc.org/sites/default/files/HousingSpotlight2-2.pdf).

Additionally, 31% of public housing residents are seniors (> 62 years old), 30% of

public housing households include a non-elderly family member who experiences

a disability, and 3.3 million children live in public housing. *Id*. at 2.

Across all public housing, about 45% of residents are black while another

third (32%) are white and a little over 20% are Hispanic.

In Arizona, 107,100 people in 51,000 Arizona households use federal rental

assistance to afford modest housing. Seventy percent are seniors, children, or

people with disabilities. Twenty percent of Public Housing Residents are African

American/Black. Center on Budget and Policies Priorities, *Arizona Federal*

*Rental Assistance Fact Sheet* in Federal Rental Assistant Fact Sheets

(updated Dec. 10, 2019), https://www.cbpp.org/research/housing/federal-rental-assistance-

fact-sheets#AZ.

And in Pinal County, 15.3% of Public Housing Residents are

African/American/ Black, while only 5.4% of the county's population are African

American/Black. Pinal Cty: Hous. & Workforce Dev. Dep't, Consolidated

Plan 2019-24, 2019-20 Annual Action Plan at 56 (Pinal Cty. AZ, 2019),

https://www.pinalcountyaz.gov/Housing/Documents/pcconsolidatedplan2019-

2024.pdf; United States Census Bureau, Quick Facts: *Pinal County* (FPinal

Cty. AZ, updated 2019),

https://www.census.gov/quickfacts/fact/table/pinalcountyarizona/LND110210.

In his book *The Color of Law*, Richard Rothstein explains the segregationist beginnings of public housing in the United States. The federal government played an important role in assisting local governments to carry out their housing segregation policies. RICHARD ROTHSTEIN, THE COLOR OF LAW: A FORGOTTEN HISTORY OF HOW OUR GOVERNMENT SEGREGATED AMERICA (2017).

> While public housing production increased in the post-war period, segregated public housing construction persisted throughout the '60s and '70s and cemented deeply segregated public housing across the country. In 1984, the *Dallas Morning News* visited 47 metropolitan areas and found nearly all public housing tenants in those areas were segregated by race, and white housing projects had better amenities.

NAT'L LOW INCOME HOUSING COALITION, *Public Housing History* (Oct. 17, 2019), https://nlihc.org/resource/public-housing-history.

It is within this historical backdrop that the Court must look at the effect of Maricopa's dual market pricing policy.

**B.    *Inclusive Communities* Did Not Change the Framework for Analysis of a Disparate Impact Case Under the Fair Housing Act where Causality is Effectively Acknowledged**

This is not a case about causality. The adverse effect on the disproportionately Black and Native American public housing residents of Pinal County was directly caused by the Defendant's pricing policy that charged them more than double what it charged the predominately White non-public housing

residents of the County. This is a traditional case of disparate impact that should have been analyzed by the Trial Court using the well-settled methodology adopted by the Supreme Court and Ninth Circuit in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015); *Wards Cove Packing Co. v. Antonio,* 490 U.S. 642, 109 S. Ct. 2115, 104 L. Ed. 2d 733 (1989); *Griggs v. Duke Power Co*., 401 U.S. 424, 91 S. Ct. 849, 28 L. Ed. 2d 158 (1971); *Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 502 (9th Cir. 2016), and scores of other similar cases.

The District Court erroneously read *Inclusive Communities* as if the Supreme Court had adopted a new and more restrictive version of disparate impact. The Supreme Court did not. Rather, it validated the recognition that traditional disparate impact theory, as set forth in *Wards Cove Packing Co.*, applied to housing discrimination cases.[3] The Supreme Court recognized the origins of the

---

[3] Every courts of appeals that had considered the matter prior to *Inclusive Communities* concluded that plaintiffs can show the FHA has been violated through policies that have a disparate impact on a minority group. *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011). *See Greater New Orleans Fair Hous. Action Ctr. v. HUD*, 639 F.3d 1078, 1085 (D.C. Cir. 2011) (acknowledging the majority view but declining to take a position on the matters); *Simms v. First Gibraltar Bank,* 83 F.3d 1546, 1555 (5th Cir. 1996); *Mountain Side Mobile Estates P'ship v. HUD,* 56 F.3d 1243, 1250–51 (10th Cir. 1995); *Jackson v. Okaloosa Cty,* 21 F.3d 1531, 1543 (11th Cir. 1994); *Casa Marie, Inc. v. Superior Court of Puerto Rico,* 988 F.2d 252, 269 n. 20 (1st Cir. 1993); *Keith v. Volpe*, 858 F.2d 467, 482–84 (9th Cir. 1988); *United States v. Starrett City Assocs.,* 840 F.2d 1096, 1100 (2d Cir.1988); *Arthur v. City of Toledo,* 782 F.2d 565, 574–75 (6th Cir. 1986); *Smith v. Town of Clarkton*, 682 F.2d

Fair Housing Act and its stated goals of addressing longstanding segregation and discrimination in housing. The Court acknowledged the historical role that government and private actors played in encouraging and maintaining a dual housing market and that the vestiges of residential segregation by race remain today. Stacy Seicshnaydre, *Disparate Impact and the Limits of Local Discretion After Inclusive Communities*, 24 GEO. MASON L. REV. 663, 670–71 (2017).

Commentators have recognized that the Court's use of the words "robust causality" was not intended to create new limits on the concept of disparate impact, but rather was intended only to reinforce long-accepted doctrine. Citing *Wards Cove Packing Co*, the Court reminded the District Courts that statistical disparity alone is not sufficient. *Inclusive Communities*, 576 U.S at 542. Where disparities did not arise from imbalances caused by the defendants' policies, no liability can be found. *See, e.g.,* Stacy Seicshnaydre, *Disparate Impact and the Limits of Local Discretion After Inclusive Communities*, 24 GEO. MASON L. REV. 663, 673 (2017) ("This language suggests that the Court was not creating new limits, but was shining a spotlight on limits in existing law")[4]; Robert G. Schwemm, *Fair Housing*

---

1055, 1065 (4th Cir. 1982); *United States v. Mitchell,* 580 F.2d 789, 791–92 (5th Cir. 1978); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 147–48 (3d Cir. 1977); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1290 (7th Cir. 1977); *United States v. City of Black Jack,* 508 F.2d 1179, 1184 (8th Cir. 1974).

[4] "The vehicle for establishing the appropriate boundary lines for the exercise of policy discretion lies in the Court's persistent focus on housing barriers.

*Litigation After Inclusive Communities: What's New and What's Not*, 115 COLUM. L. REV. Sidebar 106, 118 (2015); Shivangi Bhatia, *To "Otherwise Make Unavailable": Tenant Screening Companies' Liability Under the Fair Housing Act's Disparate Impact Theory*, 88 FORDHAM L. REV. 2551, 2558–59 (2020); *National Fair Housing Alliance v. Travelers Indemnity Co.*, 261 F. Supp.3d 20, 30 (D.D.C. 2017) (rejecting defendant's argument "robust causality" in *Inclusive Communities* altered plaintiff's burden to show discriminatory effect, holding that "*Inclusive Communities* said no such thing" and "does not require courts to abandon common sense or necessary logical inferences that follow from the facts alleged" but instead "instruct[s] courts to ensure that disparate-impact liability is confined to removing artificial, arbitrary, and unnecessary barriers.").

    The prohibition of barriers established by dual housing markets with

---

In *Inclusive Communities*, the Court upheld disparate impact liability as a targeted 'barrier removal' mechanism rather than a blunt instrument 'displacing valid governmental and private priorities'; the Court cited its decision in *Griggs v. Duke Power Co.* three times for the proposition that FHA disparate impact theory mandates the removal of 'artificial, arbitrary, and unnecessary barriers.' As I have explored in earlier work, this is the vision that the lower courts have largely implemented for forty years. In a review of four decades of appellate decisions addressing FHA disparate impact challenges, I found that the predominant claim on appeal and the predominant claim on which plaintiffs obtained positive outcomes was the housing barrier claim. Justice Kennedy cited this work in acknowledging that 'the heartland of disparate-impact suits target[s] artificial barriers to housing'." Seicshnaydre*, Disparate Impact and the Limits of Local Discretion After Inclusive Communities*, 24 Geo. Mason L. Rev. 663, 664–65 (2017).

disparate services providing one level for Whites and one for Blacks, strikes at the heart of the harm the Fair Housing Act was enacted to eradicate. In a report released in February 1968, the Kerner Commission described the nation as "moving toward two societies, one black, one white—separate and unequal." *Inclusive Communities*, 576 U.S. at 529 (quoting Kerner Commission Report at 1). *See* REPORT OF THE NATIONAL ADVISORY COMMISSION ON CIVIL DISORDERS 91 (1968) ("Kerner Commission Report"). The Commission urged Congress to enact "a comprehensive and enforceable open-occupancy law…" *Id*. (quoting Kerner Commission Report at 263). The Kerner Commission emphasized that segregated, economically distressed inner-city communities required greater municipal expenditures on "every kind of public service." John Charles Boger, *Race and the American City: The Kerner Commission in Retrospect-an Introduction*, 71 N.C. L. REV. 1289, 1301 (1993). That includes the provision of water services to residential tenants on terms that do not differ based upon the racial composition of the building.

This Court should reject the unwarranted restrictive interpretation of *Inclusive Communities* found in the District Court's opinion. As the Second and Fourth Circuits have recognized, *see Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 427 (4th Cir. 2018), *cert. denied sub nom. Waples Mobile Home Park Ltd. P'ship v. de Reyes*, 139 S. Ct. 2026, 204 L. Ed. 2d 218 (2019), and

*Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581, 607, 620 (2d Cir. 2016), the phrase "robust causality" was meant to filter out remote connections that by themselves could not render a statistical disparity actionable discrimination. In the context of one defined policy (*e.g.*, charging public housing residents more for similar services than non-public housing residents) that by its very terms significantly impacts protected class residents greater than White residents, the cause is in no way remote. The District Court misunderstood Justice Kennedy's reasoning.

The District Court's decision below requires Plaintiffs to prove the impossible: that the Defendant's policy of charging public housing residents more than double what it charged other residents was somehow the cause of the racial disparities in the population comprising the Edwards Circle public housing complex. This interpretation of Justice Kennedy's "robust causation" language turns the concept of disparate impact upside down. Instead of focusing on the effect of a neutral policy, the District Court required that the policy itself not only impact minorities disproportionately but was actually the underlying cause of the differential in demographics that allowed the impact to occur. That interpretation misses the point.

Higher utility security prices did not cause African American tenants to live in public housing to a greater extent than White tenants. As this Court recently

explained, "Throughout our nation's history, racial and ethnic minorities – especially Black Americans – have been systematically denied one of the keys to the American dream: the opportunity to own a home." *City of Oakland v. Wells Fargo,* 2020 WL 5035815, * 1 (9th Cir. Aug. 26, 2020). They have also systematically been restricted in their ability to rent apartments in the private market and to obtain jobs and accumulate wealth to the same extent as White citizens, and as a result have been concentrated into public housing developments where policies such as the one at bar disproportionately impact them.

In *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 930 F.3d 660, 661 (5th Cir. 2019), eight Judges of the Fifth Circuit acknowledged that no precedent supported an interpretation of robust causation that would require a plaintiff to prove the policy being challenged (in that case a "no vouchers accepted policy") also was responsible for the pre-existing racial disparity that allowed the policy to disproportionately impact them. *Id.* at 665 (dissenting op.).

Neither the Defendant nor the District Court in its summary judgment decision question that African American households, other persons of color, and families with children are disproportionately represented as residents of Edwards Circle public housing complex relative to their representation in the general population of Pinal County or Arizona. Neither does Defendant question the causality between the residents of Edwards Circle having to pay double-plus

security deposits to obtain water service simply because of their place of residence. This policy adopted by the Defendant applies only to public housing residents.

The two Federal Appendix cases cited by the District Court as persuasive reasons to grant summary judgment for the Defendant highlight the type of situation where the concept of robust causality is employed to filter cases in which a menu of causal factors may or may not have caused disparities—rather than the one-causal factor case at bar.[5]  *City of Los Angeles v. Wells Fargo & Co.*, 691 F. App'x 453, 454–55 (9th Cir. 2017), and *City of Los Angeles v. Bank of Am. Corp.*, 691 F. App'x 464, 465 (9th Cir. 2017), are basically the same case against two different defendants.  In the *City of Los Angeles* cases, the plaintiffs identified multiple policies that it alleged resulted in African-American borrowers paying higher loan rates than Whites, which in turn resulted in higher foreclosures and injury to minority neighborhoods and thus to the City as a whole.  The City identified three facially-neutral policies that it alleged resulted in a disparity:  (1) Wells Fargo's compensation scheme provided incentives for its loan officers to issue higher-amount loans; (2) Wells Fargo's marketing targeted low-income

---

[5] This Circuit has recently reiterated its admonition that "non-binding memorandum dispositions," like these two cases, *Wells Fargo & Co.* and *Bank of Am. Corp.* are "not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion" and should not be relied upon by a district court as the dispositive basis for its ruling.  *Grimm v. City of Portland*, 971 F.3d 1060, 1067 (9th Cir. Aug. 21, 2020).

borrowers; and (3) Wells Fargo failed to adequately monitor its loans for disparities. *Wells Fargo*, 691 F. App'x at 454-455. In *Wells Fargo*, the Court held that the City had not shown how the first two policies were connected in a robust manner to the disparities and failed to show that the third policy was even a policy. In the *Bank of America* case, the City identified sixty-two facially neutral policies that it alleged resulted in the disparity and emphasized three in particular.

But what if instead Wells Fargo or Bank of America had simply adopted a policy that borrowers living in predominately African American census tracts would have to pay loans at rates more than two times that of borrowers in White neighborhoods? Even under the reasoning of *City of Los Angeles v. Wells Fargo & Co.*, 691 F. App'x at 454–55, Plaintiffs would have established a robust connection between the Defendant's policy and the racial disparity. That is exactly the situation presented in the instant case.

## C. The District Court Misunderstood the Comparative Population to be Used in Analyzing Whether a Policy has a Disparate Impact

In *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 383–84 (3d Cir. 2011), *cert granted*, 570 U.S. 904, 133 S. Ct. 2824, 186 L. Ed. 2d 883 (2013), *cert dismissed*, 571 U.S. 1020, 134 S. Ct. 636, 187 L. Ed. 2d 415 (2013), the Supreme Court made it clear the question to be asked in a disparate impact case is not whether some White residents may be treated the same as

16

minority residents.  That is an inquiry in a disparate treatment case.  Rather, the appropriate question is whether one or more protected groups are disproportionately affected by the policy or practice at issue.  The Court pointed out that if one group is impacted more than another then a prima facie case may be established even though some non-minority residents are equally affected.

Referring to *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir. 1977), the Court illustrated this point:

> For instance, in *Rizzo,* the waiting list for public housing comprised 85% African Americans and 95% minorities, meaning that 5% were White. 564 F.2d at 142. The White residents on the list were treated the same as the minority residents on the list—each was hurt by Philadelphia's decision to block a public housing project—but we nevertheless found a violation of the FHA because cancelling the project had a 'racially disproportionate effect' on African–Americans. *Id.* at 149 ('Nor can there be any doubt that the impact of the governmental defendants' termination of the project was felt primarily by blacks, who make up a substantial *proportion* of those who would be eligible to reside there.').

(Emphasis added.)  *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011).

This Circuit has fully adopted the rationale of *Mt. Holly* in *Ave. 6E Investments, LLC v. City of Yuma,* 818 F.3d 493, 513 (9th Cir. 2016) ("In sum, we decline to follow *Hallmark* and reject the district court's determination that the availability of similarly-priced and modelled housing in the same quadrant of the City as the zoned property prevents Developers from showing a disparate impact").

*See also*, *Keith v. Volpe*, 858 F.2d 467, 484 (9th Cir. 1988) (holding that "The evidence presented shows that Hawthorne's refusal to permit construction of the project had a greater adverse impact on minorities. Of the persons who would benefit from the state-assisted housing because they are low-income displacees, two-thirds are minorities. The failure to build the projects had twice the adverse impact on minorities as it had on whites."). In other words, disparate impact analysis does not require plaintiffs to show that the challenged policy affects only protected class members. *See also*, *R.I. Comm'n for Human Rights v. Graul*, 120 F. Supp. 3d 110, 126 (D.R.I. 2015) (holding plaintiff satisfied *Inclusive Communities* "robust causality requirement" with similar statistical evidence to that here, showing families with children were overrepresented in population harmed by challenged occupancy limit).

Here, the District Court erroneously believed that if 100% of the White residents who resided at West Edwards Circle were required to pay the Public Housing resident price to get their water turned on, no disparate impact could be shown even if White residents made up only 10 % of the occupants in a County that is 79% White. This reasoning directly conflicts with established disparate impact theory and must be rejected.[6]

---

[6] In the employment law context, our courts have long held that the fact some individuals outside the protected class would be affected by the neutral policy was

**D.     Application of the Traditional Disparate Impact Framework to the Facts of this Case Mandates Reversal**

Just four years ago, this Circuit stated that, "The Fair Housing Act (FHA) is one of the most important pieces of legislation to be enacted by the Congress in the past 60 years.  It strikes at the heart of the persistent racism that so deeply troubles our Nation*." Ave. 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 496 (9th Cir. 2016).  This Circuit recently reiterated the fact that Congress intended the FHA to be given a broad and inclusive application.  *City of Oakland v. Wells Fargo,* 2020 WL 5035815, at *7, 9 (9th Cir. Aug. 26, 2020).

This Court in *Ave. 6E* makes clear that given the long history and dire consequences of continuing housing discrimination and segregation, Congress did not stop at prohibiting disparate treatment alone.  Indeed, in enacting the FHA, Congress sought "to eradicate discriminatory practices within a sector of our Nation's economy." *Inclusive Communities*, 576 U.S. at 521.  "To this end, as the Supreme Court recently reaffirmed, the FHA also encompasses a second distinct claim of discrimination, disparate impact, that forbids actions by private or governmental bodies that create a discriminatory effect upon a protected class or perpetuate housing segregation without any concomitant legitimate reason." *Ave. 6E Investments, LLC*, 818 F.3d at 502–03 (citing *id*. at 540-541).

---

of "no consequence" to a plaintiff's Title VII disparate impact claim.  *Garcia v. Spun Steak Co.*, 998 F. 2d 1480, 1486 (9th Cir. 1993).

The Court recognized that disparate impact claims provide a remedy in two situations that disparate treatment claims may not reach. First, disparate impact permits plaintiffs to counteract "unconscious prejudices and disguised animus that escape easy classification." *Id.* at 503. It is not hard to surmise what kind of "unconscious bias" may accompany a policy that requires public housing residents and public housing residents only to pay double plus security deposits. Race-related stereotypes and stigma have attached to public housing residents since their inception. *See* Carol M. Motley and Vanessa Gail Perry, *Living on the Other Side of the Tracks: An Investigation of Public Housing Stereotypes*, 32 J. OF PUB. POL'Y & MARKETING 48, 50 (2013) ("…in the United States, public housing residents are perceived as predominately ethnic peoples (mainly African American), the unemployed, and single mothers with numerous children (Stoloff 2004). In reality, while African Americans are overrepresented relative to their overall share of the population, approximately 51% of public housing residents are Caucasian, and 45% are African American.").

Second, disparate impact serves not only to uncover unconscious or consciously hidden biases, but it also targets "artificial, arbitrary, and unnecessary barriers" to minority housing and integration that can occur through unthinking, even if not malignant, policies of developers and governmental entities. *Inclusive Communities*, 576 U.S. at 540-41. In this way, disparate impact "recognize[s] that

20

the arbitrary quality of thoughtlessness can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." *United States v. City of Black Jack,* 508 F.2d 1179, 1185 (8th Cir. 1974); *Ave. 6E Investments, LLC*, 818 F.3d at 503.

The framework for analyzing a fair housing case based upon disparate impact was ignored by the District Court. The three-part shifting burden framework, which requires a prima facie showing of disparate impact, has been engraved in employment and housing jurisprudence and has proved a workable methodology for Courts and litigants. *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 978-79, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988); *Mt. Holly Gardens Citizens in Action, Inc. v. Twp. of Mount Holly*, 658 F.3d 375, 384 (3d Cir. 2011); *Ave. 6E Investments, LLC v. City of Yuma,* 818 F.3d 493, 513 (9th Cir. 2016); *Hallmark Developers, Inc. v. Fulton Cty.,* 466 F.3d 1276, 1287 (11th Cir. 2006) (collecting cases); *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 577 (2d Cir. 2003); *Keith v. Volpe,* 858 F.2d 467, 484 (9th Cir. 1988) (same); *Resident Advisory Bd. v. Rizzo,* 564 F.2d 126, 142 (3d Cir. 1977) (same).

First, a plaintiff must prove a prima facie case of discrimination by showing that a challenged practice causes a discriminatory effect on one or more protected groups. If the plaintiff makes a prima facie case, the defendant must then prove "that the challenged practice is necessary to achieve one or more substantial,

21

legitimate, nondiscriminatory interests." If the defendant meets its burden, the plaintiff must then show that the defendant's interests "could be served by another practice that has a less discriminatory effect." *Inclusive Communities Project, Inc. v. Texas Dep't of Hous. & Cmty. Affairs*, 747 F.3d 275, 282 (5th Cir. 2014), *aff'd and remanded*, 576 U.S. 519, 135 S. Ct. 2507, 192 L. Ed. 2d 514 (2015).

A plaintiff's initial burden to establish discriminatory effect is "[t]ypically … demonstrated by statistics." *Hallmark Developers, Inc. v. Fulton Cty.*, 466 F.3d 1276, 1286 (11th Cir. 2006). In each of what the Supreme Court approvingly referred to as "heartland" disparate-impact cases in *Inclusive Communities*, 576 U.S. at 540-541, the courts relied on the plaintiffs' comparative statistical evidence to find a housing practice's discriminatory effect. *See Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 938 (2d Cir. 1988); *United States v. City of Black Jack,* 508 F.2d 1179, 1186 (8th Cir. 1974); *Greater New Orleans Fair Hous. Action Ctr. v. Saint Bernard Parish*, 641 F. Supp.2d 563, 567 (E.D. La. 2009).

In each of the cases cited by the Supreme Court in *Inclusive Communities*, the plaintiff was not required to show that the policy at issue was responsible for the statistical disparity. For example, in *Huntington*, the plaintiffs challenged zoning policies that precluded the construction of a Section 8 subsidized housing development. The Second Circuit held that the plaintiffs made "a strong prima facie showing of discriminatory effect" by presenting statistics showing that 7% of

families in the town needed subsidized housing while 24% of Black families needed subsidized housing, 60% of the families holding Section 8 certificates and 61% of those on the waiting list for certificates were minorities. *Huntington*, 844 F.2d at 938. Plaintiffs were not required to show that the zoning policies were responsible for Black and minority families qualifying for subsidized housing at a greater rate than Whites in the community. And in *City of Black Jack*, 508 F.2d at 1186, the government was not required to show that the ordinance was responsible for Blacks having lower incomes that in turn excluded them disproportionately from obtaining housing in the city.

None of the plaintiffs in the cases the Supreme Court deemed "heartland" cases could have met the District Court's erroneous causation requirement. None could meet the impossible requirement of showing that the defendants were responsible for the racial disparities in income levels between Blacks and Whites which caused Blacks to disproportionately meet the eligibility requirements for the affordable housing developments at issue.

The Plaintiffs in this case met their initial burden of establishing that the double-plus security deposit disproportionately affected the predominately minority residents of Edwards Circle. They did this by presenting statistical evidence from their expert, Dr. Elizabeth Wentz, Arizona State University Dean of Social Sciences, that while African Americans make up only 2.9% of the heads of

households in the Defendant's service area, they make up 38.9% of the heads of household at Edwards Circle. Similarly, Native Americans and female headed households with children were significantly overrepresented as residents of Edwards Circle compared to the Defendant's service area. The Defendant offered no refutation to Dr. Wentz's findings that there were statistically significant disparities on the basis of race, national origin, and gender/familial status between the residents of Edwards Circle and others serviced by Defendant MDWID.

Traditional disparate impact analysis required that the burden shifted to the Defendant to prove that its challenged practice of charging public housing residents double-plus security deposits was necessary to achieve one or more substantial, legitimate, nondiscriminatory interests. The District Court cut the legs off this analysis by jettisoning the disparate impact framework and substituting a unique and unsupported element that injected disparate treatment requirements and misdirected causality into his opinion.

This Court should reverse the District Court's grant of summary judgment, and remand with directions to follow the universally accepted framework for proving disparate impact liability.

## III. CONCLUSION

Had Defendant imposed a double security deposit policy solely upon the residents living in census tract 1160 in Phoenix, where 26.3% of the residents are

African-American, in a City that is 6.93% Black or African American, the

disparate impact would be evident and few would question its discriminatory

effect. *See* U.S. CENSUS BUREAU, *Census Tract 1160 Maricopa AZ,* CENSUS

REPORTER (2018), https://censusreporter.org/profiles/14000US04013116000-census-tract-

1160-maricopa-az/; U.S. CENSUS BUREAU, *ACS Demographic and Housing Estimates*

(2017),

https://data.census.gov/cedsci/table?q=DP05&g=1600000US0455000&tid=ACSD

P5Y2017.DP05. There is no material difference in the impact of such a theoretical

policy and the actual policy adopted by the Defendant in this case. The District

Court applied a flawed analysis under current and long-standing precedent. Its

decision should be reversed.

Dated: October 6, 2020

MacDonald Hoague & Bayless

By: *s/ Jeffrey L. Taren*
Jeffrey L. Taren, WSBA # 50275
Jesse Wing, WSBA # 22751
705 Second Avenue, Suite 1500
Seattle, WA 98104
JeffreyT@mhb.com
JesseW@mhb.com
(206) 622-1604
*Counsel for Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32(a)(7)(C)
AND CIRCUIT RULE 32-1**

I to certify that, pursuant to Fed. R. App. P. 32(a)(7)(C) and Ninth Circuit

Rule 32.1, the foregoing amicus brief is proportionately spaced, has a typeface of

14 points, and contains 5,912 words.

Dated:  October 6, 2020

Respectfully submitted,

MacDONALD HOAGUE & BAYLESS

*s/ Jeffrey L. Taren*
*Counsel for Amici Curiae*

26

## CERTIFICATE OF SERVICE

I certify that on the date noted below I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all registered participants.

Dated:  October 6, 2020

MacDONALD HOAGUE & BAYLESS

*s/ Jeffrey L. Taren*
*Counsel for Amici Curiae*